BARNETT *et al.* v. WAY *et al.*

No. 1089.    Opinion Filed November 14, 1911.

(119 Pac. 418.)

1.    **INDIANS—Creek Lands—Descent and Distribution.** The descent .and distribution of the allotted lands of an enrolled Creek Indian, who died before the ratification of the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. 861), and who had during her lifetime allotted to her under section 11 of the Curtis Act (Act June 28, 1898, c. 517, 30 Stat. 495) the use and occupancy of the surface of the allotment, which was thereafter by section 6 of the Original Creek Treaty ratified and deed issued to her heirs therefor, is, by reason of section 28 of the Original Creek Treaty, regulated and controlled by the law of descent and distribution of the Creek Nation.

2.    **SAME.** In determining who are the heirs of a deceased enrolled Creek Indian, who during her lifetime received the allotment of the use and occupancy of an allotment, which, after her death, was ratified to her heirs by virtue of section 6 of. the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. 861), the laws of descent ·and distribution of the Creek Nation are to be applied as if the deceased Indian had received title to her allotment during her lifetime and died seized thereof.

3.    **SAME.** An enrolled Creek Indian died February 8, 1900, and left surviving her as her relations her father, some brothers and

sisters, some of whom were the children of the father and mother of the deceased and others were the children of the father by a former wife, not the mother of the deceased, and also left a half-brother and the children of a half-sister, who were children of the deceased's mother by other husbands than the father of the deceased. The deceased's father died on March 17, 1900. **Held,** under section 28 of the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. 861), the children of the father inherited the allotment of the deceased to the exclusion of the half-brothers and the children of the half-sisters, who were the children of the deceased's mother.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; John H. King, Judge.*

Action by Thomas J. Way, Irvin Blanchard, and Delia Squires, a minor, by W. S. Grout, guardian, against Pompey Barnett and Thomas Davis, a minor, by Eddie Davis, guardian. Judgment for plaintiffs, and defendants bring error. Affirmed.

*Z. T. Walrond,* for plaintiffs in error.

*Maxey & Runyan* and *Marrs & Marrs,* for defendants in error.

HAYES, J.   This action was originally brought by defendants in error in the United States Court for the Western District of the Indian Territory for partition and to set aside and have canceled certain invalid deeds as a cloud upon title to the land in question.   Upon the admission of the state, the cause was transferred to the district court of Muskogee county.   The decree of that court disposes of the void instruments satisfactorily to all parties, but that part of the decree which determines who the heirs of Cita Barnett, a deceased Creek Indian, are, and distributes among them her allotment of land, is complained of in this proceeding.   There is no controversy about the facts.   Cita Barnett, a Creek Indian, died on the 8th day of February, 1900.   During her lifetime she had allotted to her as a member of the Creek Tribe of Indians the use and occupancy of the N. W. ¼ of section 35, township 16 N., range 15 E.   She left surviving her as her next of kin her father, George Barnett, her full brothers

and sisters, Johnson Barnett, Janétta Johnson, *nee* Barnett, a half-brother, Pompey Barnett, a niece, Delia Squires, *nee* Barnett, and a nephew, Thomas Davis.· Her mother was the second wife of her father, and her father was the third husband of her mother. Louisa Barnett is the half-sister of Cita Barnett by reason of her being an illegitimate child of her father by a woman other than Cita's mother, but recognized by her father as his daughter. Delia Squires is Cita Barnett's niece by reason of her being a child of a daughter of George Barnett by his first wife. Pompey Barnett was a half-brother; because of·his being a son of Cita's mother by her second husband, and Thomas Davis is a nephew, because of his being the son of a daughter of Cita's mother by her first husband. This contest is between, on the one side, the children of George Barnett, their heirs and grantees, and, on the other side, Pompey Barnett and Thomas Davis of kin to Cita Barnett on her mother's side, but of no blood relation to George Barnett. George Barnett, the father of the deceased allottee, died on the 17th day of March, 1900. His wife, the mother of Cita, had died prior to Cita's decease. It is the contention of defendants in error that George Barnett, upon the death of Cita, inherited her allotment, and upon his death it descended to· his children, and the judgment of the trial court in giving the entire allotment to the heirs of the father, George Barnett; sustained this contention.

In considering this question, it is to be noted that the initial allotment of land to Cita Barnett· was made and her death and the death of her father, George Barnett, occurred prior ·to the enactment. of the act of Congress, entitled "An act to ratify and confirm an agreement with the Muskogee and Creek Tribes of Indians and .for other purposes" (Act March 1, 1901, c. 676, 31 Stat. 861), and generally known as the Original Creek Treaty. Section 28 of that act provides: · .

"All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled under section twenty-one of the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, entitled, 'An act for the protection of the people of the Indian Territory, and for other

purposes,' shall be placed upon the rolls to be made by said commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

The act of 1898, referred to in the foregoing statute, is commonly called the Curtis Act. By section 11 of the Curtis Act (Act June 28, 1898, c. 517, Stat. 495) it is provided that when the roll of citizenship of any of the Five Civilized Tribes or Nations is fully completed as provided by law; the Dawes Commission shall proceed to allot the exclusive use and occupancy of the surplus of all lands of any such nation or tribe among the citizens thereof as shown by the roll of the tribe, giving each as far as possible his fair and equal share. Cita Barnett was allotted during her lifetime the use and occupancy of the land in controversy under the provisions of this statute; but the allotment of lands to an Indian under this statute does not vest the allottee with any title to the fee in the land, nor does it provide for the allottee's acquiring the fee thereto. It was only the use and possession of the land that was allotted to them under it, so that, when Cita Barnett died, she did not have any title to or estate in the fee in the land constituting her allotment, and the fee therefore could not and did not descend at that time to her heirs.

The Creek Tribe of Indians, prior to the ratification of the Original Creek Agreement in 1901 and the allotment of lands thereunder, held the title to its tribal lands in the Creek Nation as a political society under a patent issued to the tribe by the United States government under the provisions of the treaty of the United States with said tribe in 1833 (Act Feb. 14, 1833, 7 Stat. 417). By that patent the fee-simple title to said lands, subject to a contingent reversionary interest in the United States, was conveyed to the tribe, and the tribe was guaranteed the lands conveyed so long as it existed as a nation and continued to occupy them. Under this patent, however, the individual Creek

Indian received no title to any part of the lands. The title was in the nation, and the individual members could and did enjoy only possessory rights to occupy and use part of it. Congress, by the Curtis Act, subject to the approval of this tribe, provided not only for breaking up the tribal lands into allotments for use and occupancy of the surface by the individual members, but to convey the title thereto to the allottees. That act as enacted by Congress included within its provisions in an amended form a treaty or agreement made by the Commission to the Five Civilized Tribes with the Creek Indians on the 27th day of September, 1897. Sections 1 to 12, inclusive, of that treaty provide for allotment of the lands to the individual members of the tribe, and for conveyance of the title thereto to the allottees; but the act provides that the provisions of that amended treaty shall not become effective unless ratified by the tribe at an election for that purpose on a date expressed in the act. The tribe rejected the amended treaty, and the Curtis Act, as it finally became effective, contained no provision under which the Creek Indian could acquire the legal title to any of the tribal lands. Notwithstanding the failure of the Creek Tribe to ratify the proposed treaty, the Commission to the Five Civilized Tribes proceeded to allot, and prior to the ratification of the original treaty on May 25, 1901, did allot, under section 11 of the Curtis Act, to many members of the tribe the use and occupation of the surface of that portion of the tribal lands to which each member of the tribe was entitled, and Cita Barnett was one of such allottees.

Section 6 of the Original Creek Treaty provides that allotments, made to Creek citizens prior to the ratification of that agreement to which there was no contest and which did not include public property, were thereby ratified; and that the same should in all things be governed by the provisions of that treaty. Cita Barnett's allotment did not fail because made before the ratification of the treaty; for by said section 6 it was ratified, and by section 28 was made to carry and vest in her heirs as an allottee all the right and title she would have received by such allot-

ment, if it had been made to her after the ratification of the treaty.

It is unimportant, for the purpose of this case, whether the right and estate thus conferred upon the heirs is one of inheritance or one of purchase. It is plain that the allotment of the deceased, Cita Barnett, with all the rights added thereto by the treaty became, under section 28, the rights of her heirs. While the treaty does not name the heirs who shall take, it does provide that the allotment of a deceased member not received by him during his lifetime, to which he would be entitled if living, "shall descend to his heirs according to the laws of descent and distribution of the Creek Nation and be allotted and distributed to them accordingly." It is to be noted that this act, which first provides for the extinguishment of the tribal title and conveyance thereof, together with the reversionary right of the federal government, to individual members of the tribe, provides that if any member be deceased, and therefore unable to receive the grant provided for by the treaty, then the right of allotment shall descend to, and the lands shall be allotted and distributed to, the heirs of deceased in accordance with the rule of descent and distribution therein named. What the rule of descent and distribution was at the time of the death of Cita Barnett and her father, George Barnett, is unimportant; for, at the time of her death, she had no title, equitable or legal, in the fee in her allotment to descend. The rule of descent and distribution adopted by the treaty and to be applied in such case is the rule of descent and distribution in force in the Creek Nation, governing the devolution of property owned by any of its deceased members at the time of such member's death.

The law of descent of the Creek Nation at the time of the death of Cita and her father and at the time of the ratification of the Original Creek Agreement, in so far as it is material in this case, was as follows:

"Be it further enacted that if any person dies without a will, having property and children, the property shall be equally divided among the children by disinterested persons, and in all cases,

where there are no children, the nearest relation shall inherit the property." (Chapter 6, Laws of Creek Nation, 1880 Compilation.)

The Creek Tribe of Indians has, for a number of years, been a civilized tribe and recognized as such; but, until legislation of Congress, looking to the allotment of their lands in severalty, this tribe had maintained a tribal government. Its domestic affairs, the political and the property rights of its members were, in a large measure, governed by tribal laws; and the members of the tribe had little knowledge, and many of them were totally ignorant, of the laws governing the similar rights of their white neighbors. The change in the system of ownership of tribal lands by the allotment thereof to the individual members was an important one to the Indians. It was the most important step in the legislation looking to the dissolution of the tribal government and to the preparation of the Indian for the advent of statehood and the subjecting of him and his property to the laws of the state of which he was to become a citizen. It cannot be doubted, as the history of the negotiations between the nation and the government discloses, that these Indians did not readily agree to this radical change in the system of the ownership of their lands. So long as the title remained in the tribe, they knew that they, their heirs and descendants, would have the use of their lands as they had theretofore; but if the title was transferred to the individual members, and upon their death descended to somebody under a law with which trey were not familiar, they were apprehensive that the tribal lands would in time become lost to their heirs and descendants. It can be readily understood why they chose to retain, as a rule of descent and distribution, the Creek laws. Crude, imperfect, and difficult of application to estates in lands as the law is, the Indians were familiar with their own law. They knew that under it, at the death of any Indian, such Indian's property went to certain kinsmen of the deceased; that the order of descent was not determined by the happening of some event in the future or fixed by the deceased's status at some time prior to his death; and

we think it was the intent to provide that the land which a deceased Indian would have been entitled to as allotment, if he had not died before allotment, should be allotted to and received by those persons as heirs of such Indian that would have received it under the Creek laws, if the allotment had been made to the deceased at the time of his death and had descended under said law.

This conclusion does not conflict with the judgment or opinion of this court in *Hooks et al. v. Kennard et al.,* 28 Okla. 457, 114 Pac. 744. In that case the allotments of three deceased Creek Indians were involved. One of the deceased Indians died in 1900, before the ratification of the Original Creek Agreement in May, 1901. The other two died in the year 1901, after the ratification of the Original Creek Agreement; but, before the ratification and proclamation of the Supplemental Creek Agreement in 1902, the allotments to all three were made in the order named after the ratification of the Original Creek Agreement, and before the ratification of the Supplemental Agreement with the Creek tribe, ratified on June 30, 1902 (Act June 30, 1902, c. 1323, 32 Stat. 500), and proclaimed by the President as a law August 8, 1902 (32 Stat. 2021). Patents to all the allotments were issued to the heirs of the deceased Indians in 1904, after the Supplemental Treaty had become a law. The contest in that case was whether descent was cast when the allotments were made to the heirs, whoever they were, and when they became vested with the equitable title, at which time the Creek laws of descent and distribution were in force, or at the issuance of patent and conveyance of legal title, at which time the laws of descent and distribution provided by chapter 49, Mansfield's Dig. of the Statutes of Arkansas (Ind. T. Ann. St. 1899, c. 21) were in force. It was held that the law in force at the date when the allotments were segregated and made governed, and not the law in force when patent issued. It was not involved in that case whether, in applying the law of descent and distribution to determine who are the heirs that take the allotment of a deceased Creek Indian, dying before allotment to him, the law shall be applied as if the

deceased had received his allotment at the time of death or as if he had lived until the time the allotment is selected, which is one of the questions involved and decided in this case.

Our conclusion that section 28 of the Original Treaty prescribes the law of descent that governs the distribution of the tribal lands to which Cita Barnett was entitled, is not sound, if the allotment to a member of the tribe under section 11 of the Curtis Act means the same thing as an allotment to a member within the meaning of said terms as used in section 28 of the Original Agreement and in the other sections of that treaty; for in that event Cita Barnett had received her allotment before the enactment of the treaty, and she was vested with an equitable title to the fee therein at the time of her death, and such estate descended at that time to her heirs by virtue of the law of descent and distribution then in force, and not by virtue of some law subsequently enacted, for this court has several times held that the segregation of an allotment to a Creek Indian under the provisions of the Original Treaty and the issuance of certificate of allotment vest in the allottee or his heirs, in the event of his death before allotment, an equitable title to the fee of the lands allotted. *Hooks et al. v. Kennard et al., supra,* and cases therein cited.

Section 11 of the Curtis Act is not clear in its meaning. Language may be found therein upon which it may be contended with some reason that it was the legislative intent that an allotment made by the Dawes Commission under the authority of that section to a member of any of the tribes or nations should vest in such allottee the title or the right to the title in the lands allotted. The same sentence of the section that provides for the allotment of the use and occupancy of the surface provides that the oil, coal, asphalt, and mineral deposits in the lands of the tribes shall be reserved to the tribe, and no allotment of such land shall carry title to such oil, coal, asphalt, or mineral deposits. Applying the familiar rule of construction, *"expressio unius est exclusio alterius,"* it would seem from this language that it was intended that an allotment made under this statute

should carry to the allottee the right or the title of the tribe in the lands allotted, except as to any oil, coal, asphalt, or mineral deposits that might be found therein.   But, as has often been said by the courts, rules of construction are not to be applied arbitrarily.   Their application is to be made when such application will aid in ascertaining the legislative intent.   If the application of a rule leads to a construction contrary to the legislative intent, it is not to be applied.   The meaning of section 11 and the authority granted by it to the Dawes Commission to make allotments cannot be determined by looking at that section alone. The entire act must be construed together, and all its parts be made to harmonize, if possible.   The history of the negotiations between Congress and these tribes, looking to the dissolution of the tribal government and the abolition of tribal ownership of the lands and to subsequent legislation of Congress upon the same subject embraced within said section, may be looked to to ascertain the general purpose of the Curtis Act and the construction that Congress itself has placed upon it.   This act contains an agreement made by the Dawes Commission with commissioners representing the Choctaw and Chickasaw Tribes on the 23d day of April, 1897, as amended by the act.   The first provision of this treaty is that "all the lands" within the Indian Territory belonging to the Choctaw and Chickasaw Tribes shall be allotted to the members of said tribes, and a subsequent clause provides that, as soon as practicable after completion of the allotments, patents shall be executed by the principal chief of the nation and the Governor of the Chickasaw Tribe to such allottees, conveying to each allottee all the right, interest, and title of the tribes in the lands allotted.   As hereinbefore stated, this act also contained a proposed treaty with the Creek Tribe, section 1 of which provides that there shall be allotted out of the lands owned by the Creek Nation to each citizen of the Creek Nation 160 acres; and section 12 provides that, after the completion of such allotments, there shall be executed and delivered to each allottee a patent, conveying to him all right, interest, and title to the lands so allotted.   It is clear that it was intended

by these provisions of the proposed treaties to allot not only the use and occupancy of the lands to the individual members of the tribe, but the land itself, and to extinguish the tribal title by conveying it to the allottees. But the act provides that the provisions of these treaties shall not become effective unless the treaties be ratified by the tribes before dates fixed in the act. To hold that it was intended by section 11 to authorize the commission to allot the lands, and by the allotment thereof to vest the title or the right to the title in the allottees, would render the provisions of this act inconsistent and convict 'Congress of gross duplicity in its dealings with the Indians under this act; for under such construction, by the treaty provisions of the act, Congress said to the Creek, Choctaw and Chickasaw Tribes, "If the tribes consent, the tribal lands will be allotted and title divested out of the tribes and vested in the allottees"; and, by section 11, said that such will be done, whether the tribes consent or not. It is a general rule of construction, without exception, that an act shall be construed so as to give effect to all its provisions, if such construction is not inconsistent with the general purposes of the act and its provisions are not necessarily conflicting. *Bernier v. Bernier*, 147 U. S. 242, 13 Sup. Ct. 244, 37 L. Ed. 152.

The subsequent legislation of Congress relative to the allotment of these lands shows that Congress placed no such construction on this act. The treaty proposed in the Curtis Act to the Chickasaw and Choctaw Tribes was adopted by those tribes; but the treaty proposed to the Creek Tribe was, as before stated, rejected by that tribe. Shortly thereafter, through the Dawes Commission, Congress began the negotiation of another treaty with the Creek Tribe, which, in an amended form, was ratified and confirmed by Congress in an act approved March 1, 1901, being the Original Creek Agreement already referred to herein. But the provisions of that act are that its provisions shall not become effective unless the same are ratified by the Creek National Council within 90 days from the approval of the act by the President. Section 3 of this treaty provides that "all lands of said tribe, except as herein provided, shall be allotted among

the citizens of the tribe by said commission so as to give each an equal share of the whole in value as nearly as may be," and then provides the manner of allotment.    Section 23 provides for the execution and issuance by the principal chief of the tribe, to be approved by the Secretary of the Interior, a patent to each allottee, whereby the tribal title and all the right, title, and interest of the United States shall be conveyed and relinquished to the allottees.    Later, the Supplemental Creek Treaty was negotiated and adopted by Congress and the tribe, dealing with the allotment of the tribal lands and the conveyance of the title to the allottees.    On March 1, 1901, there was approved an act of Congress, entitled "An act to ratify and confirm the agreement with the Cherokee Tribe of Indians and for other purposes" (Act March 1, 1901, c. 675, 31 Stat. 848).    The passage of this act occurred after the enactment of the Curtis Act.    The treaty therein contained provides for the allotment of the lands of the Cherokee Nation to the members of that tribe and the conveyance of the title to the allottees, but that act was to become effective only if ratified by the majority vote of the members of the tribe at an election to be held for that purpose.

On the 16th day of December, 1897, the Dawes Commission entered into a treaty with the representatives of the Seminole Tribe, which was ratified by act of Congress approved July 1, 1898 (Act July 1, 1898, c. 542, 30 Stat. 567), just three days after the approval of the Curtis Act.    This treaty provides that the lands of the Seminole Tribe shall be divided equally among the members of the tribe; that each allottee shall have the sole right of occupancy of the lands so allotted to him during the existence of the tribal government, and until the members of the tribe shall become citizens of the United States; and that, when tribal government shall cease, a deed shall be executed to each allottee, conveying to him the title to the lands so allotted to him.    Thus, it appears that by all the treaties negotiated by the Dawes Commission with these tribes just before and after the passage of the Curtis Act, which in amended forms were ratified by Congress, Congress was endeavoring to obtain the

consent of the tribes to the allotment of their tribal lands and to the divesting of tribal title. It is part of the history of the con-·dition of tribal affairs at the time of this legislation that in some of these nations the lands were held, occupied, and used under the tribal laws in large tracts or bodies by the more thrifty members of the tribe to the exclusion of by far the larger number of the tribes, who received but little, if any, benefits from their lands. Those holding large bodies of the tribal lands naturally would be averse to surrendering the advantage they enjoyed un-·der the tribal ownership and control; and, among many of those who did not hold any of the lands, there was reluctance to give up a system with which they were familiar and adopt one with which they were not familiar. It was in a large measure, we think, to remedy this condition that Congress provided by section 11 of the Curtis Act that whether the tribes ratified the treaty proposed or not, and thereby consented to the allotment of their lands and the divesting of their tribal titles, the use and occupancy thereof should be distributed equally among the members of the tribe, thereby accustoming and educating the entire membership of the tribe to an individual control and use of a part of the tribal lands, and progress at the same time be made toward the allotment of lands and conveyance of the title thereto when consent should ultimately be obtained from the tribes. Under this view of the meaning of said section 11, Cita Barnett had no estate in the fee in her allotted lands at the time of her death, and descent of her allotment was not cast at that time.

The remaining question is: Who would have inherited her allotment, applying the Creek law of descent and distribution, put in force by the Original Treaty, if Cita Barnett had received her allotment in her lifetime and been seised thereof at the time of her death? As she had no children, it would have descended to her nearest relations. Her nearest relations, if living, were her parents. The parents are nearer of kin than brothers and sisters. 4 Kent Comm. (13th Ed.) p. 395. Of them, the mother is nearer than the father within the meaning of the Creek law. *De Graffenreid et al. v. Iowa Land & Trust Co.,* 20 Okla. 687,

95 Pac. 624. But of her parents, Cita Barnett's father alone survived her. He therefore would have inherited her allotted lands, had she received them before her death, and upon her death they would have descended to his children, to the exclusion of the children of Cita Barnett's mother by her husband other than George Barnett.

There is no controversy between the heirs of the father about the distribution of the allotment between them, and the judgment of the trial court is affirmed.

All the Justices concur.