## DIVINE v. HARMON *et al.*

No. 1357.    Opinion Filed December 12, 1911.

Rehearing Denied January 23, 1912.

(121 Pac. 219.)

**INDIANS—Lands—Allotment—Descent.** Will S. Harmon, an enrolled Creek Indian, prior to the ratification of the ''original agreement,'' on May 27, 1901, selected and had allotted to him by the Dawes Commission an allotment in the Creek Nation, upon which he was residing with his wife at the time of his death, March 1, 1900. His only heirs were his wife, two brothers, and one sister, there being no children nor descendants of children, nor father nor mother, nor grandfather nor grandmother. After May 27, 1901, the wife brought suit for partition of said allotment.    **Held:**

First.    That by virtue of sec. 6 of the said ''original agreement'' the allotment so taken was ratified and confirmed in all things as though selected after May 27, 1901.

Second.    That immediately upon his death March 1, 1900, his heirs, by virtue of sec. 28 of said ''original agreement,'' became vested with the fee of his estate in said allotment.

Third.    That his heirs are to be determined by virtue of the Creek Law of descent and distribution in effect at the time of his death.

Fourth.    That the devolution of said estate was governed by the Creek Law of descent and distribution, which should be applied as if the deceased had received title to his allotment during his lifetime, and was seized thereof, but inasmuch as there was no estate in said land until the ratification of the ''original agreement,'' which was after his death, the said law would not apply until that time, to wit, May 27, 1901.

Fifth.    Under sec. 28 of the ''original agreement,'' the wife of the deceased inherited one-half of the allotment, and the brothers and sister the remainder.

(Syllabus by Robertson, C.)

*Error from District Court, Muskogee County; John H. Pitchford, Judge.*

Action by Ollie Divine, *nee* Harmon, against Ben T. Harmon and others for partition of land. Judgment for defendants, and plaintiff brings error. Reversed, and remanded, with instructions.

*Williams & Williams,* for plaintiff in error.

*Charles Bagg,* for defendants in error.

Opinion by ROBERTSON, C.   This case was tried to the court below on the following agreed statement of facts:

"AGREED STATEMENT OF FACTS.

"First.   That the plaintiff herein was the lawful wife of Will S. Harmon, deceased, at the time of his death.

"Second.   That the said Will S. Harmon, deceased, was a citizen of the Creek Nation or tribe of Indians.

"Third.   That as such citizen of such tribe or nation of Indians the said Will S. Harmon had during his lifetime allotted to him all the lands described in plaintiff's complaint herein.

"Fourth.   That at the time of his death the said Will S. Harmon, deceased, was in possession of said lands.

"Fifth.   That the said Will S. Harmon, deceased, died on the 1st day of March, A. D. 1900.

"Sixth.   That at the time of his death the said Will S. Harmon, deceased, had neither children nor descendants of children, neither father nor mother, neither grandfather nor grandmother, and that the only living blood relations of the said Will S. Harmon, deceased, at the time of his death were the defendants herein, who were his full brothers and sister, respectively.

"Seventh.   That the said Ollie (Harmon) Divine is a white woman, and is not now, nor never was, a citizen of any nation or tribe of Indians.

"Eighth.   That immediately after the death of the said Will S. Harmon, deceased, the said Ollie (Harmon) Divine abandoned the lands in controversy, and moved to and took up her residence at Westville, Cherokee Nation, Indian Territory, and has resided there ever since and that she is now the wife of one ——— Divine.

"Ninth.   That on the 4th day of September, A. D. 1901, the said Ben T. Harmon was duly appointed the administrator of the estate of the said Will S. Harmon, deceased, and that the plaintiff herein never made any attempt to be appointed the administratrix of her said husband's estate.

"Tenth.   That ever since the said death of the said Will S. Harmon, deceased, the defendants herein, Ben T. Harmon, Dan Harmon, and Mattie Boles, have been in actual, exclusive, and visible possession of all the lands in controversy.   That they have collected the rents and profits therefrom, and have never accounted to the plaintiff therefor.   That they have never recognized plaintiff as having any rights whatever in or to the lands in controversy, or to the rents or profits therefrom; but at all times have denied the right of plaintiff in and to said lands and

all parts thereof, and to the rents and profits therefrom, all of which facts were at all times known to the plaintiff.

"Eleventh.   That the plaintiff prior to the institution of this suit has never attempted to assert her claims to the lands in controversy.

"Twelfth.   That the records and files in this case or anywise affecting the matters in controversy, together with the date thereon and therein, and all statutes, rules, and regulations of the several departments of the government of the United States or of the various tribes or nations of Indians, shall speak for themselves, and shall be given such effect as they may be entitled.

"In witness whereof, we, the attorneys of record, representing the respective parties to this suit, have hereunto set our hands and seals this the 10th day of January, A. D. 1908.

"WILLIAMS & WILLIAMS,<br>"Attorneys for Plaintiff.<br>"CHAS. BAGG,<br>"Attorney for Defendants."

Will S. Harmon, under and by virtue of the act of June 10, 1896 (29 Stat. 339, c. 398), was allotted by the Commission to the Five Civilized Tribes the land in controversy, and with his wife Ollie (Harmon) Divine, the plaintiff in error, was residing thereon at the time of his death, on March 1, 1900.   Under the act of June 7, 1897 (30 Stat. 84, c. 3), it was provided among other things that:

"Said commission shall continue to exercise all authority heretofore conferred upon it by law to negotiate with the Five Tribes, and any agreement made by it shall operate to suspend any provisions of this act, as in conflict therewith as to said nation."

By virtue of the authority of the section just recited the Commission to the Five Civilized Tribes and the representatives of the Creek Nation negotiated a treaty commonly known as the "Original Agreement," which was ratified by Congress on March 1, 1901 (31 Stat. L. 861, c. 676), and by the Creek Council May 27, 1901, and in section 6 thereof we find the following, to wit:

"Sec. 6.   All allotments made to Creek citizens by said commission prior to the ratification of this agreement, as to which there is no contest, and which do not include public property,

and are not herein otherwise affected, are confirmed and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement: and said commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore, conforming to provisions herein; and all controversies arising between citizens as to their right to select certain tracts of land shall be determined by the said commission."

At the time of Harmon's death, to wit, March 1, 1900, he had no vested right in said allotment, as was decided by *Wallace v. Adams,* 143 Fed. 716, 74 C. C. A. 540. Had he lived until the 27th of May, 1901, without further action on his part, he would have become vested with the equitable title in and to said allotment, and, as sections 6 and 28 of the "original agreement" were intended to protect all such allottees and their heirs in their interests in said allotments by providing for the ratification and confirmation of their allotments selected prior to the date of said "original agreement" as Harmon's was, and also provided how it should descend at his death, we see that whatever interest in and to said allotment he would have had on May 27, 1901, had he lived, at once vested in his heirs, and they took on said last mentioned date all his right, title, and interest in and to said land, notwithstanding he had died prior to the date of the said "original agreement." It is quite evident, therefore, that at the time of Will S. Harmon's death on March 1, 1900, the equitable title to the land in question at once vested in his heirs, and it therefore becomes necessary for us to now determine who his heirs were at the time of his death and what law of descent and distribution is to control in the devolution of said allotment.

Section 28 of the said "original agreement," *supra,* reads as follows:

"All citizens who are living on the first day of April, 1899, entitled to be enrolled under section 21, of the act of Congress, approved June 28th, 1898, entitled, 'An act for the protection of the people of Indian Territory, and for other purposes' shall be placed upon the rolls to be made by said commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die before receiving his allotment of lands, and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his

heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

As has been seen, prior to May 27, 1901, and by virtue of section 11 of the Curtis act (Act June 28, 1898, c. 517, 30 Stat. 497), the Dawes Commission had allotted lands to many members of the Creek Tribe, notwithstanding the rejection of the amended treaty of September 28, 1897, which had been negotiated by the Dawes Commission with the Creek Nation, and it was during this time that Will S. Harmon was allotted the land in controversy. To be sure that he was thereby given only the possessory right to use and occupy the surface, section 6 of the "original agreement," *supra,* as ratified May 27, 1901, confirmed and ratified all such allotments theretofore made, and provided that they should be in all things governed by the provisions of the said "original agreement," and as has been said by Mr. Justice Hayes in *Barnett et al. v. Way et al.,* 29 Okla. 780, 119 Pac. 418, in discussing the status of a Creek Indian's allotment under identical conditions:

"Cita Barnett's allotment did not fail because made before the ratification of the treaty, for, by said section 6 it was ratified, and by section 28 was made to carry and vest in her heirs as an allottee all the right and title she would have received by such allotment, if it had been made to her after the ratification of the treaty. It is unimportant for the purpose of this case whether the right and estate thus conferred upon the heirs is one of inheritance or one of purchase. It is plain that the allotment of the deceased, Cita Barnett, with all the right added thereto, by the treaty became, under section 28, the rights of her heirs. While the treaty does not name the heirs who shall take, it does provide that the allotment of a deceased member not received by him during his lifetime, to which he would be entitled if living, 'shall descend to his heirs according to the laws of descent and distribution, of the Creek Nation, and be allotted and distributed to them accordingly.' It is to be noted that this act which first provides for the extinguishment of the tribal title and conveyance thereof, together with the reversionary right to the federal government to individual members of the tribe, provides that, if any member be deceased and therefore unable to receive the grant provided for by the treaty, then the right of allotment shall descend to and the lands shall be allotted and distributed to the heirs of the deceased in accordance with the rule of descent and distribution

therein named. What the law of descent and distribution was at the time of the death of Cita Barnett, and her father, George Barnett, is unimportant; for at the time of her death she had no title, equitable or legal, in the fee in her allotment to descend. The rule of descent and distribution adopted by the treaty and to be applied in such case is the rule of descent and distribution in force in the Creek Nation governing the devolution of property owned by any of its deceased members at the time of such member's death."

The law of descent and distribution in force in the Creek Nation at the time of Harmon's death, so far as this case is concerned, is as follows:

"Sec. 6. Be it further enacted that if any person die without a will, having property and children, the property shall descend to the child, or children and their descendants, if any, equally, and if no children or descendants, and the estate descended to the intestate on the part of the father, then to the father, and if no father living then to the brothers and sisters of the blood of the father, etc., provided."

"Sec. 8. The lawful or acknoweldged wife of the deceased husband shall be entitled to one-half of the estate if there are no children or their descendants, and a child's part if any such there be, in all cases where there is no will. The husband surviving shall inherit of the wife in a like manner." (Laws Creek Nation 1880, Compilation.)

See, also, *De Graffenreid v. Iowa Land & T. Co.,* 20 Okla. 687, 95 Pac. 624, in which it was held that section 6, *supra,* of the original agreement, was not such a legislative grant as would pass the absolute title both legal and equitable to the allottee.

Section 2448, Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1512; 6 Fed. Stat. 514), reads as follows:

"Where patents for public lands have been or may be issued in pursuance of any law of the United States, to a person who had died, or who hereafter dies, before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees or assignees of such deceased patentee as if the patent had issued to the deceased person during life."

Thus it is seen that the patent to which Harmon was entitled, but which had not yet been issued to him by the United States, was the only thing lacking to complete the title to both the equit-

able and legal estate in said allotment, and also that, in case of his death, whatever title he might be entitled to vested in his heirs.    Prior to the issuance of the patent, the fee to the land was in the Creek Nation.    Section 6 of the "original agreement," *supra,* provided that all allotments theretofore made (May 27, 1901), which included the land in controversy, were to stand as made, and as made, to stand on equal footing as to appraisement and all things else, as though made after and by virtue of said agreement, which, in the language of *Sanders v. Sanders,* 28 Okla. 66, 117 Pac. 341, "includes their devolution on descent cast, with those to be made under said agreement."    Said section fixed the status of the allotment under consideration, and provided as to how it should go on descent cast, which was that it should stand on an equal footing with those that were to be made thereunder, and right then was to be governed as to its devolution by the provisions of that agreement.

Section 7 of that agreement reads as follows:

"The homestead of each citizen shall remain after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he had no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done the land shall descend to his heirs according to the law of descent and distribution of the Creek Nation, free from such limitation."

Quoting from *Sanders v. Sanders, supra,* these sections would seem, in plain terms, to place it beyond peradventure that it was the intent of this agreement that all allotments that had been made, or would be made thereunder before descent cast, should on that event descend to the heirs of the person casting descent, "according to the laws of descent and distribution of the Creek Nation"; that is, that it should be distributed to such heirs as might be provided by said law, so that the next question for us to consider is, When was the descent cast in this case?

It has been repeatedly held by this court that the selection and filing upon an allotment of land was the inception and beginning of the title of the allottee or his heirs, and that when a patent, which is only the evidence of title, is issued, it relates back to the inception of title.    *De Graffenreid v. Iowa Land &*

*T. Co.,* 20 Okla. 687, 95 Pac. 624; *Godfrey v. Iowa Land & T. Co.,* 21 Okla. 293, 95 Pac. 792; *Irving et al. v. Diamond,* 23 Okla. 325, 100 Pac. 557.

In *Hooks et al. v. Kennard et al.,* 28 Okla. 463, 114 Pac. 746, it is said:

"If we apply that principle to the case at bar, the title to the allotments of three Creek allottees whose estates are involved herein passed to and became vested in their heirs at the date said allotments were segregated and allotted in their names, and, as at that time the original agreement was in force, the Creek Law of descent and distribution must be looked to to determine the heirs and the shares and portions of the allotments they are entitled to as directed by the second paragraph of section 28 of said agreement, which provides that 'all citizens who were living on the first day of April, 1899, entitled to be enrolled under section 21, of the act of Congress approved June 28th, 1898, entitled "An act for the protection of the people of the Indian Territory and for other purposes" [Act June 28, 1898, c. 517, 30 Stat. 502] shall be placed upon the rolls to be made by said commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands, and distributive share of the funds of the tribe, the lands and money to which he would be entitled if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly.' "

In *Barnett et al. v. Way et al., supra,* it was said:

"The rule of descent and distribution adopted by the treaty and to be applied in such connection is the rule of descent and distribution in force in the Creek Nation governing the devolution of property owned by any of its deceased members at the time of such member's death."

In the same case it was further held that Cita Barnett, an enrolled Creek Indian, who had died before the date of the ratification of the "original agreement," but who had, during her lifetime, been allotted certain lands under section 11 of the Curtis Act, *supra,* the use and occupancy of which was thereafter by section 6 of the "original agreement" ratified had no estate in the fee to her allotted land at the time of her death, and that, though the descent was cast at the time of her death, yet the law of the descent and distribution must be applied as of the date of the act

of ratification of her allotment, to wit, May 27, 1901. Thus, while Will S. Harmon died March 1, 1900, yet the law applicable to the casting of descent in his estate must be applied as of the date of the ratification of the "original agreement," to wit, May 27, 1901, for it was on that date that the equitable title to his estate became vested in his heirs. At that time his heirs consisted of his lawful and acknowledged wife, Ollie (Harmon) Divine, the plaintiff in error, and Ben T. Harmon and Dan Harmon and Mattie Harmon, brothers and sister, defendants in error, and according to section 8 of the Creek law of descent and distribution, *supra,* the wife would be entitled in this case to one-half of said land when the descent was cast, and not until then, which, as we have seen, was on May 27, 1901. This being true, the second contention of defendants in error, that the statute of limitations had run against the action, cannot be sustained, for the action having been instituted March 7, 1907, seven years had not elapsed since the estate became vested in the heirs, to wit, May 27, 1901. It therefore becomes unnecessary to determine the questions of cotenancy, and adverse possession, etc., raised by the parties in their briefs, and, while we venture no opinion as to whether the bar of the statute of limitations could be interposed by defendants in error in the instant case as against the plaintiff in error, we do hold that the heirs of Will S. Harmon became vested with the equitable title in and to the land involved in this controversy on May 27, 1901, the date of the ratification by the Creek Council of the "original agreement," and that the present action was not barred by the statute of limitations, and that consequently the learned judge in the court below erred in sustaining defendant's demurrer to the complaint.

For the foregoing reasons, the judgment of the district court of Muskogee county should be reversed, and the cause remanded with instructions to enter a judgment in favor of plaintiff in error, and against the defendants in error, in accordance with the prayer of the complaint.

By the Court: It is so ordered.

All the Justices concur.