**TOM et al. v. MILLS.**

No. 10587—Opinion Filed March 28, 1922.

Rehearing Denied June 13, 1922.

Second Rehearing Denied Sept. 26, 1922.

(Syllabus.)

**1. Indians—Allotments—Vesting of Title— Selection by Parents of Creek Minor.**

A selection of an allotment under the provisions of section 11 of the Curtis Bill (Act June 28, 1898, c. 517, 30 Stat. at L. 497) made by father and mother of a Creek minor by virtue of certificate of selection issued by the Dawes Commission October 19, 1899, did not vest the allottee with any title to the fee in the land, and no way was provided under the provision of that act for the allottee to obtain title, and the method by which allottee could obtain title was first provided by the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. at L. 861).

**2. Same—Enrollments — Powers of Dawes Commission.**

Acting under the enrollment provisions of the Curtis Act of June 28, 1898, and the Creek Agreement of March 1, 1901, the Dawes Commission was a quasi judicial tribunal, and enrollments made by it and approved by the Secretary of the Interior are presumptively correct; and, unless impeached by very clear evidence of fraud, mistake, or arbitrary action, they are conclusive.

**3. Same—Striking Names from Rolls.**

Whether or not a person alleged to be a member of the Creek Nation was living on April 1, 1899, is one of the questions going to the right of such person or his heirs to have his name enrolled under section 28 of Agreement of March 1, 1901, which the Dawes Commission was competent to decide; it is not a jurisdictional question, and an incorrect determination of it does not necessarily render the action of the commission, in striking the name of an allottee from the rolls of the tribe prior to the time the same became final, void.

**4. Same—Conclusions of Commission's Action—Judgment—Affirmance.**

The evidence in the case examined, and the action of the trial court in holding that the same was wanting in proof of such arbitrary action on the part of the Dawes Commission as would establish a mistake of the law or fact, warranting an impeachment of its action in striking from the roll one Indian and awarding the allotment to another in whose name the allotment in question was made and patented, was not contrary to the clear weight of the evidence and such judgment is affirmed.

Error from District Court, Tulsa County; Conn Linn, Judge.

Action by C. C. Mills against Lucy Tom, nee Bigpond, and others to quiet title. Judgment for plaintiff, and defendants bring error. Affirmed.

Ramsey, DeMeules, Rosser & Martin and James J. Mars, for plaintiffs in error.

Bell & Fellows, for defendant in error.

JOHNSON, J. This is an appeal from the district court of Tulsa county, Okla., brought by the plaintiffs in error, Lucy Tom, nee Bigpond, Johnson Bigpond, and James J. Mars, defendants below, for the reversal of a judgment of said trial court in favor of the plaintiff, C. C. Mills, and against said defendants, quieting the title to eighty (80) acres of land located in Tulsa county, Okla.

The petition of the plaintiff, C. C. Mills, was filed in the district court of Tulsa county, Okla., on the 14th day of November, 1917, and is in the usual form, stating that plaintiff is in possession of the lands, and that the defendants claim some right, title, or interest therein, which claims constitute a cloud upon the title of the plaintiff.

Thereafter the defendants, on the 31st day of January, 1918, filed their answer and cross-petition, in which the possession of said lands by the plaintiff is admitted, also the execution and delivery of a contract bearing date of July 31, 1916, between Lucy Tom, nee Bigpond, and Johnson Bigpond, as parties of the first part, and James J. Mars et al., as parties of the second part, wherein the said Lucy Tom, nee Bigpond, and Johnson Bigpond contracted with the parties of the second part that they, the parties of the second part, should bring suit for parties of the first part and act as attorneys in the proposed litigation whereby the parties of the first part would seek to gain possession of the lands in question and establish their title thereto. The answer and cross-petition also admits the recording of this instrument in the office of the county clerk of Tulsa county, Okla., on August 28. 1916.

The answer and cross-petition further avers that the said Lucy Tom, nee Bigpond, and Johnson Bigpond are the mother and father, respectively, and the sole heirs of Gussie Bigpond, deceased, and that the said Gussie Bigpond was regularly enrolled as a Creek full-blood citizen under roll No. 3256, and that there was selected for and allotted to her as a part of her allotment of the lands of the Creek Tribe of Indians, the 80 acres in question, and that a certificate of selection and allotment was regularly issued and delivered by the Commission to the Five Civilized Tribes at the Muskogee Land Office therefor, on the 19th day of October, 1899, and delivered to these defendants as the heirs of said Gussie Bigpond, under and by virtue of which, and their heirship as the father and mother, they claim to be the rightful and sole owners in fee of said tract of land.

Thereafter, on April 25, 1918, the plaintiff filed his reply and answer to defendants' cross-petition, and after denying generally, admitted that Lucy Tom, nee Bigpond, and Johnson Bigpond are the sole and only heirs of Gussie Bigpond and that they each were on the final rolls of the Creek Tribe of Indians. Plaintiff averred that Gussie Bigpond was born on or about the 15th day of May, 1899, and died on or about the 15th day of March, 1900, and that she was listed for enrollment by the Commission to the Five Civilized Tribes and that on March 19, 1904, the Secretary of the Interior authorized the Commission to the Five Civilized Tribes to strike her name from the Creek rolls, which was there and then done, and that thereafter Lucy Tom, nee Bigpond, and Johnson Bigpond, on the 8th day of February, 1905, filed a motion to reopen the matter of her right to enrollment, which was allowed, and on and between the 12th day of May and the 18th day of August, 1905, hearings were had, and that defendants and each of them were present at said hearings and were represented by counsel, and at the conclusion of said hearings the name of the said Gussie Bigpond was, by order of the Secretary of the Interior, stricken from the rolls of the Creek Tribe of Indians, and that all of this was done before the rolls were finally closed on the 4th day of March, 1907.

Plaintiff further averred that on the 30th day of August, 1904, the lands under consideration were allotted and patented to Tom Barnett, a Creek Indian, under roll No. 9874, and that patents were issued to him by the Principal Chief of the Creek Tribe of Indians on the 3rd day of February, 1905, and approved by the Secretary of the Interior, and that pursuant to his certificates of allotment and his patent he went into possession of said lands, and that by reason of mesne conveyance the plaintiff became the owner of said lands and has been in possession thereof by himself or grantors since the 30th day of August, 1904.

This reply and answer further pleads an estoppel against these defendants by reason of their having stood by and permitted these lands to be sold and improved without asserting any title or ownership thereto during all the lapse of time mentioned.

Thereafter on the 3rd day of May, 1918, the defendants filed a denial to each and every material allegation contained in the answer and reply of plaintiff.

The plaintiffs in error have assigned 16 specifications of error in their petition, concerning which counsel say in their brief:

"The principal question in this case is presented by the 14th, 15th, and 16th assignments of error. The questions raised by these assignments of error are whether, under the circumstances, the Secretary of the Interior could strike the name of Gussie Bigpond from the rolls and cancel her allotment."

The foregoing statement of counsel, we think, fairly presents the sole question for our determination. The determinative questions of fact are undisputed, and a brief summary thereof is substantially as follows:

Gussie Bigpond is admitted to be the daughter of defendants Johnson Bigpond and Lucy Tom, nee Bigpond, who were both on the authenticated Creek Indian rolls of 1890 and 1895. She was born May 10, 1899. October 19, 1899, she was enrolled "by the Commission under Creek Indian Field Card No. 1010, along with her father, and mother, and on the same date both citizenship and allotment certificates were issued permitting the selection in allotment of her pro rata share of the lands of the Creek Nation. On March 13, 1902, a partial schedule of Creeks by blood having thereon the name of Gussie Bigpond, opposite roll No. 3256, was approved by the Secretary of the Interior." The rolls, however, did not become final until March 4, 1907 (Act April 26, 1906, 34 Stat. L. 137).

Gussie Bigpond's name was, without notice, stricken from the roll on March 19, 1904, by the Dawes Commission, based upon statements that she was not living April 1, 1899, in affidavits of Johnson Bigpond and John Bigpond, father and grandfather.

After Gussie Bigpond's name was stricken from the rolls, and on the 30th day of August, 1904, the lands involved were allotted and patented to Tom Barnett, a Creek Indian under roll No. 9874, and the patents were issued to him by the Principal Chief of the Creek Tribe of Indians n the 3rd day of January, 1905, and approved by the Secretary of the Interior, and pursuant thereto he went into possession of said lands and by mesne conveyance the plaintiff claims to be the owner of said land and has been in possession thereof by himself or grantors since the 30th day of August, 1904.

Counsel for plaintiffs in error discuss in their brief what they denominate the sole question to be decided; that is, "whether, under the circumstances, the Secretary of the Interior could strike the name of Gussie Bigpond from the rolls and cancel her allotment," under four propositions, to wit:

"1. Gussie Bigpond was entitled to enrollment.

"2. It is perfectly clear that under this section (section 21 of the Curtis Act), if no other law had been passed on the subject Gussie Bigpond was regularly and lawfully enrolled and would have received an allotment.

"3. The attempted cancellation of the allotment of Gussie Bigpond was void.

"4. The Secretary of the Interior had no right to cancel the allotment which had been made to Gussie Bigpond."

Counsel for defendant in error in their brief agree to the first proposition made by the plaintiffs in error, wherein they say:

"Plaintiffs in error herein, defendants below, at page 20 of their brief, state the following proposition: 'Gussie Bigpond was entitled to enrollment.' We entirely agree with this proposition. Gussie Bigpond was entitled to enrollment and her allotment of the use and occupancy of the surface of one hundred sixty acres of land in the Creek Nation under and in pursuance of an act of Congress approved June 28, 1898 (30 Stat. L. 495, section 11), which act is hereinafter referred to as the 'Curtis Act.'

"We prefer, therefore, to state the proposition as follows: 'Gussie Bigpond was entitled to enrollment and allotment of the use and occupancy of 160 acres of land of the Creek Nation under the authority of section 11 of the Curtis Act.'"

The record discloses that on March 19, 1904, Thos. Ryan, acting Secretary of the Interior, directed a letter to the Commission to the Five Civilized Tribes, directing that the name of Gussie Bigpond be stricken from the rolls; that thereafter, on February 3, 1905, Lucy Tom, nee Bigpond, made application seeking to have the matter of the right of Gussie Bigpond to enrollment reopened, and thereafter, on March 4, 1907, the acting Secretary of the Interior informed the commission that the order striking the name of Gussie Bigpond from the roll was adhered to.

Upon the trial of the cause, a stipulation by the parties was entered in the record which is as follows:

"It is stipulated and agreed by and between the plaintiff and defendants that the lands in question, to wit, the west one-half of the northeast quarter of section 28, township 17 north, range east, was—

"The Court: Tulsa county, Okla.

"Mr. Bell: Tulsa county, Okla., was allotted to Tom Barnett under date of August 4, 1904, and that an allotment certificate was issued to him on the date last mentioned. That Tom Barnett was a duly enrolled Creek by blood; enrolled opposite roll No. 9874. That thereafter said lands were patented to the said Tom Barnett under date of August 30, 1904, and that the patents were approved by the Secretary of the Interior on January 3, 1905, and that

thereafter the said. Tom Barnett, by warranty deed, sold and conveyed to Rufus B. Thompson the lands hereinbefore described, one deed to Rufus B. Thompson bearing date of November 1, 1909, and the second bearing date of May 5, 1910. That said deeds were duly placed of record in the office of the register of deeds of Tulsa county, Okla., and that thereafter under date of June 25, 1910, C. C. Mills, for a valuable consideration, purchased said lands from the said Rufus B. Thompson. Is that agreed to, Mr. Mars?

"Mr. Mars: Yes, that is admitted; that the records show all this."

As we have seen, the trial court rendered a judgment in favor of C. C. Mills, the plaintiff, quieting his title to the land in controversy. It must be conceded that this judgment was correct, provided that it be determined that the commission and the Secretary of the Interior had the power to strike from the rolls of the Dawes Commission the name of Gussie Bigpond.

Section 28 of the Original Creek Treaty (31 Stat. L. 861), commonly known as the Curtis Act, provides in part as follows:

"All citizens who are living on the 1st day of April, 1899, entitled to be enrolled under section 21 of the act of Congress approved June 28, 1898, entitled 'An Act for the protection of the people of Indian Territory and for other purposes,' shall be placed upon the rolls to be made by said commission under said act of Congress and if any such citizen has died since that time, or may thereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs, according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly.

"All children born to citizens so entitled to enrollment, up to and including the 1st day of July, 1900, and then living, shall be placed on the rolls made by said commission; and if any such child shall die after said date, the lands and moneys to which it would be entitled, if living, shall descend to its heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly.

"The rolls so made by said commission, when approved by the Secretary of the Interior, shall be the final rolls of citizenship of said tribe, upon which the allotment of all lands and the distribution of all moneys and other property of the tribe shall be made, and to no other persons."

It was by virtue of this provision, and subsequent legislation by Congress, that Gussie Bigpond's name was stricken from the roll; the commission holding that she

was not living on the first day of July, 1900, and that therefore she was not eligible to be upon the rolls and to receive an allotment of land in fee simple; holding, in effect, that the allotment certificate issued to her on October 19, 1899, by virtue of section 11 of the Curtis Act only entitled her to the use and occupancy of the land, and she had no right to an equitable or legal ownership in fee.

Such was the holding of the court in the case of Barnett v. Way, 29 Okla., 780, 119 Pac. 418; Woodward et al. v. DeGraffenried, 36 Okla. 81, 131 Pac. 162, 238 U. S. 284. In the latter case the Supreme Court of the United States stated as follows:

"It is the contention of the defendant in error, sustained by Oklahoma courts, that the allotment of Agnes Hawes under the Curtis Act did not vest in her the fee or any heritable interest; that the equitable fee was first vested in her 'heirs' by the provision of the original Creek agreement."

And further holding as follows:

"From what we have said it results that, when Agnes Hawes, having received an allotment under the Curtis Act, died in June, 1900, without other interest in the land, her interest died with her, and there was nothing upon which the Arkansas law of descent could operate."

It seems quite clear that Gussie Bigpond, by her allotment of the surface rights under the Curtis Act, supra, acquired no vested rights in and to the fee simple title to the land, and that her heirs acquired no interest whatever therein.

The Original Creek Treaty, which became effective May 25, 1901, provided for the Commission to the Five Civilized Tribes to continue with its work of making up the Creek rolls, and section 28 thereof provided in part as follows:

"The rolls so made by the commission and approved by the Secretary of the Interior, shall be the final rolls of citizenship of said tribe upon which the allotment of all lands and the distribution of all moneys and other property of the tribe shall be made, and to no other persons."

Section 4 of the Supplemental Creek Treaty, approved by act of Congress June 30, 1902, and ratified by the Creek Nation July 26, 1902, effective by proclamation of the President August 8, 1902 (32 Stat. L. 500), is as follows:

"Exclusive jurisdiction is hereby conferred upon the Commission to the Five Civilized Tribes to determine, under the direction of the Secretary of the Interior, all controversies arising between citizens as

to their right to select certain tracts of land."

In the case of United States v. Wildcat, a Minor, et al., 244 U. S. 111, after reviewing the acts of Congress, supra, the Supreme Court, in an opinion by Day, J., in the body of the opinion said:

"The legislation which we have outlined indicates the purpose of Congress to make provision for the partition of the lands belonging to the Creek Nation among the members of the tribe, and to that end it authorized the Dawes Commission to make investigation and determine the names of such as were entitled to be on the rolls of citizenship and to participate in the division of the tribal lands. This purpose indicated in the Curtis Act of 1898 was emphasized by the so-called Creek Agreement of 1901, subsequently ratified by the tribe. In that act the commission was authorized to investigate the subject, and its action when approved by the Secretary of the Interior was declared to be final. There was thus constituted a quasi judicial tribunal whose judgments within the limits of its jurisdiction were only subject to attack for fraud or such mistake of law or fact as would justify the holding that its judgments were voidable. Congress by this legislation evidenced an intention to put an end to controversy by providing a tribunal before which those interested could be heard and the rolls authoritatively made up of those who were entitled to participate in the partition of the tribal lands. It was to the interest of all concerned that the beneficiaries of this division should be ascertained. To this end the commission was established and endowed with authority to hear and determine the matter.

"A correct conclusion was not necessary to the finality and binding character of its decisions. It may be that the commission in acting upon the many cases before it made mistakes which are now impossible of correction. This might easily be so, for the commission passed upon the rights of thousands claiming membership in the tribe and ascertained the rights of others who did not appear before it, upon the merits of whose standing the commission had to pass with the best information which it could obtain.

"When the commission proceeded in good faith to determine the matter and to act upon information before it, not arbitrarily, but according to its best judgment, we think it was the intention of the act that the matter, upon the approval of the secretary, should be finally concluded and the rights of the parties forever settled, subject to such attacks as could successfully be made upon judgment of this character for fraud or mistake.

"We cannot agree that the case is within the principles decided in Scott v. McNeal,

154 U. S. 34, and kindred cases, in which it has been held that in the absence of a subject-matter of jurisdiction an adjudication that there was such is not conclusive, and that a judgment based upon action without its proper subject being in existence is void. In Scott v. McNeal it was held that a probate court had no jurisdiction to appoint an administrator of a living person and to sell property in administration proceedings after finding that he was in fact dead. In that case it was held that a sale of the property of a living person by order of the probate court without notice to him necessarily deprived him of due process of law by selling his property without notice and by order of a court which had no jurisdiction over him in any manner. The notice in such cases to his next of kin, the court held, was not notice to him, and to make an order undertaking to deprive such person of his property would be to take it by a judgment to which the living person was not a party or privy; and it was held that jurisdiction did not arise from the mere finding of the court that the person whose property was thus taken was in fact deceased. In the present case the government had jurisdiction over these lands. It had the authority to partition them among the members of the tribe. Shulthis v. McDougal, 170 Fed. Rep. 529, 534; McDougal v. McKay, 237 U. S. 372, 383.

"For this purpose it determined to divide the lands among those living on April 1, 1899, and constituted a tribunal to investigate the question of membership and consequent right to share in the division. We think the decision of such tribunal, when not impeached for fraud or mistake, conclusive of the question of membership in the tribe, when followed, as was the case here, by the action of the Interior Department confirming the allotment and ordering the patents conveying the lands, which were in fact issued. If decisions of this character may be subject to annulment in the manner in which the government seeks to attack and set aside this one, many titles supposed to be secure would be divested many years after patents issued, upon showing that the decision was a mistaken one. The rule is that such decisions are presumably based upon proper showing and that they must stand until overcome by full and convincing proof sufficient within the recognized principles of equity jurisdiction in cases of this character to invalidate them. Maxwell Land-Grant Case, 121 U. S. 325, 379, 381; Colorado Coal & Iron Co. v. United States, 123 U. S. 307. * * *

"It is true that the methods followed by the commission may not have been the most satisfactory possible of determining who were entitled to enrollment as living persons on April 1, 1899, but it must be remembered that there were many persons whose right to enrollment was being considered, and the commission in good faith made an honest endeavor to keep the names of per-

sons off the rolls who were not entitled to appear as members of the tribe upon the date fixed by Congress. We think the testimony very far from showing such arbitrary action on the part of the commission in placing Thlocco's name on the rolls as would establish that mistake of law or fact which is essential to the impeachment of the action of the commission."

In the foregoing excerpts the learned justice was discussing two propositions, which he stated as follows:

"The government in the brief filed in its behalf, reduces the questions necessary to decide the merits of this appeal to two: First, Should the evidence offered by the government to show that Thlocco died prior to April 1, 1899, have been admitted? Second, Should the judgment of the district court be reversed because the enrollment of Thlocco and the allotment to him were made arbitrarily and without evidence as to whether he was living or dead April 1, 1899?"

The contentions of the government in the Wildcat Case, supra, were identical with the contentions of the plaintiff, defendant in error, in the instant case. The bill of complaint in the Wildcat Case alleged that Thlocco was a Creek Indian by blood; that he died at about the beginning of the year 1899, and that he was not entitled to be enrolled as a citizen of the Creek Nation or to receive an allotment of any part of its lands under the acts of Congress; that on or about May 24, 1901, the Commission to the Five Civilized Tribes caused his name to be placed on the roll of the Creek citizens by blood which the commission was then preparing; that thereafter, on June 30, 1902, the commission issued a certificate of allotment in Thlocco's name and homestead and allotment patents purporting to convey the land allotted were executed by the Principal Chief of the Creek Nation on March 11, 1909, and approved by the Secretary of the Interior on April 3, 1903; that thereafter, on December 13, 1905, the Secretary of the Interior, by executive order, caused Thlocco's name to be stricken from the roll of citizens by blood of the Creek Nation, and he is not an enrolled citizen by blood or otherwise of the Creek Nation, is not now and has never been entitled to an allotment of land therein because he died prior to April 1, 1899; and that the patents have never been delivered to Thlocco or to any other person, but are in the possession of the complainant through its officers and agents.

The bill contained numerous other allegations not necessary to mention, and prayed that the patents to the land be canceled, as they cast a cloud upon the title of the tribal land of the Creek Nation. The answer alleged, in substance, that Thlocco was living April 1, 1899, denied that the commission acted arbitrarily and without evidence in placing Thlocco's name on the roll and allotting the land to him, and alleged that the commission was not guilty of any gross mistake of fact or law, but acted upon evidence satisfactory to it and sufficient in law and in fact, and that the commission was vested with jurisdiction to determine when persons were entitled to enrollment as citizens of the nation and entitled to allotment, and that its decision having been approved by the Secretary of the Interior, "said enrollment, allotment, and patent cannot be canceled, nor can the issue of fact upon which the commission placed the name of said Barney Thlocco upon the approved Creek roll be tried again, and that the court is without authority of law or jurisdiction to reopen or retry the question of fact sought to be put in issue by the United States."

Upon the trial of the cause the government offered to show by witnesses and circumstances that Thlocco in fact died in January, 1899. Upon objection to this evidence by the defendant the trial court ruled that the question whether Thlocco was living April 1, 1899, was one of the questions which the law submitted to the Dawes Commission, and that its decision, placing Thlocco's name on the tribal roll, could only be attacked upon the ground of fraud, error of law, or gross mistake of fact, or upon the ground that the commission acted arbitrarily and wholly without evidence, and dismissed the government's bill. The Supreme Court affirmed the decision of the trial court, and stated the law of the case in the syllabus as follows:

"Acting under the enrollment provisions of the Curtis Act of June 28, 1898, and the Creek Agreement of March 1, 1901, the Dawes Commission was a quasi judicial tribunal, and enrollments made by it and approved by the Secretary of the Interior are presumptively correct; and, unless impeached by very clear evidence of fraud, mistake, or arbitrary action, they are conclusive.

"Whether or not a person alleged to be a member of the Creek Nation was living on April 1, 1899, is one of the questions going to the right of such person or his heirs to have his name enrolled under section 28 of Agreement of March 1, 1901, which the Dawes Commission was competent to decide; it is not a jurisdictional question, and an incorrect determination of it does not necessarily render the enrollment void. Scott v. McNeal, 154 U. S. 34, distinguished.

"In enrolling members of the Creek Tribe in 1901, the Dawes Commission was authorized to presume that a person enrolled as a member of the tribe on the tribal rolls of 1895, was living on April 1, 1899, in the absence of proof of his death before that day or of circumstances indicating that he had died before the commission acted."

We think the rules there announced are applicable in the instant case. In both cases the authority of the Dawes Commission, in the one in enrolling the allottee, and in the other, refusing to enroll the applicant, was challenged, and in each instance the action of the commission was upheld by the trial court.

In the instant case there was no evidence tending to show that the commission was guilty of fraud or mistake or acted arbitrarily in striking the name of Gussie Bigpond from the roll, but, upon the contrary, the affidavit of the father and grandfather of Gussie Bigpond was, in effect, that she died on March 15, 1900, and was not living on the first day of July, 1900, and therefore she was not entitled to enrollment under the act of Congress, section 28 of the Original Creek Agreement, supra.

We think, and so hold, that under the Original Creek Agreement and the act supplemental thereto, supra, the Dawes Commission and the Secretary of the Interior were clothed with authority, during the period of time that the rolls were in the making and prior to the time that the rolls became final, to purge the rolls of names that were wrongfully upon the rolls, as well as to add thereto names of persons entitled to enrollment; that such was within the power conferred upon the commission, and that such action of the commission, in the absence of fraud or mistake, is conclusive.

We think that the judgment of the trial court is not clearly against the weight of the evidence, but, upon the contrary, is supported thereby. The judgment of the trial court is, therefore, affirmed.

HARRISON, C. J., and KANE, MILLER, and KENNAMER, JJ., concur.