## BILBY et al. v. GILLILAND.

No. 3315.    Opinion Filed December 20, 1913.

(137 Pac. 687.)

On Rehearing March 24, 1914.

(139 Pac. 988.)

**INDIANS—Allotment—Right to Alienate.**    "Where a member of the Creek Tribe of Indians, entitled to be enrolled under section 21 of Act of Congress approved June 28, 1898, entitled, 'An Act for the protection of the people of the Indian Territory and for other purposes' (30 St. at L. 495, c. 517), died subsequent to the 1st day of April, 1899, but before having received the allotment of lands to which he was entitled as a member of said tribe of Indians, said lands, by reason of section 28 of the Original Treaty with the Creek Tribe of Indians (Act March 1, 1901, c. 676, 31 St. at L. 861), descended to his heirs, free from restrictions upon alienation imposed by section 7 of said Original Creek Treaty and by section 16 of the Supplemental Treaty with the Creek Tribe of Indians (Act June 30, 1902, c. 1323, 32 St. at L. 500), and a warranty deed, executed by the heirs after the allotment of said lands to them, conveyed the fee-simple title thereto"—following **Deming Inv. Co. v. Bruner Oil Co.,** 35 Okla. 395, 130 Pac. 1157.

(Syllabus by Harrison, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Action by John W. Gilliland against Nicholas V. Bilby and others to quiet title. Judgment for plaintiff, and defendants bring error. Reversed.

*Lewis C. Lawson,* for plaintiffs in error.

*Warren & Miller,* for defendant in error.

Opinion by HARRISON, C. This was an action by John W. Gilliland against Nicholas V. Bilby, John S. Bilby, and Indian Land & Trust Company to quiet title to the S. W. ¼ of section 5, township 6 north, range 9 east. The land in question had fallen to the heirs of a deceased member of the Creek Tribe of Indians whose name had been placed upon the rolls as a full-blood but who had died before receiving his allotments.

The plaintiff alleged that he was the legal and equitable owner of the land in question, but did not disclose his chain of title, but did allege that defendant Nicholas V. Bilby claimed an interest in said land by virtue of a warranty deed from the heirs of the deceased, and that defendant John S. Bilby claimed an interest by virtue of a lease for a period of 99 years which had been executed by Nicholas V. Bilby to the Indian Land & Trust Company and by the trustee of said Land & Trust Company assigned to John S. Bilby, and that such conveyances constituted a cloud on his title, which he prayed to have removed. Defendants Nicholas V. and John S. Bilby filed separate demurrers and, same being overruled, filed separate answers to plaintiff's petition; Nicholas V. Bilby setting up his chain of title.

The cause was tried in April, 1911, and judgment rendered in favor of plaintiff, Gilliland, decreeing title to the land in question in said Gilliland and ordering the deeds through which Nicholas V. Bilby claimed to be canceled and held for naught and the lease through which John S. Bilby claimed to be canceled also. From such judgment plaintiffs in error appeal to this court.

The material facts in the case are: That Little Peter, a full-blood Creek Indian, died in 1899; that his name had been placed on the rolls of such Tribe, but that at the time of his death he had not received his allotment; that after his death, under the provisions of the Original and Supplemental Treaty with the Creek Indians, an allotment which could have been selected by deceased, had he lived, was allotted to his heirs, who were Jennie,

Millie, Sallie, and Louis Peters; that on August 15, 1904, the heirs of Little Peter,, who were then adults, executed a deed of conveyance of said land to Nicholas V. Bilby, which deed was duly recorded August 24, 1904, pursuant to which he went into possession of the land, made substantial and valuable improvements thereon, and remained in exclusive and undisturbed possession of same in person and through tenants, receiving all the rents and profits therefrom and exercising complete control over same up to the time this controversy arose. The further facts appear that in October, 1908, one J. O. Chapman procured a deed of conveyance from the same heirs to the same land and in January, 1910, executed a quitclaim deed to said land to the plaintiff, John W. Gilliland. It also appears that the deed from the heirs of Little Peter to J. O. Chapman was approved by the county judge of Hughes county.

While plaintiffs in error present and argue at great length each of twelve separate assignments of error occurring during the trial of the cause, the question whether Nicholas V. Bilby held a valid title is, under the record, the only question that it is necessary to decide. If his deed was valid, it is unnecessary to determine whether or not Chapman's deed would have been valid had none ever been made by the heirs to Bilby. We will therefore consider the validity of Bilby's deed. In considering this, however, let it be borne in mind that the father of these heirs died before the allotment was taken, and that after his death an allotment which, under the treaty, could have been taken by him, had he lived, was taken by his heirs. The question then is whether such allotment, coming to his heirs in this wise, could be alienated or conveyed by them in August, 1904. This identical question with reference to a full-blood Choctaw Indian was before this court in the case of *Hancock v. Mutual Trust Co.*, 24 Okla. 391, 103 Pac. 566, in which case the syllabus is as follows:

"Lands allotted (homestead and surplus) under the provisions of section 22, c. 1362, 32 St. at L. 641, approved July 1, 1902, in the name of a deceased member of the Choctaw Tribe of Indians, are alienable by his heirs after lawful selection, prior to the lapse of one, three, or five years, and prior to the issuance of certificate or patent."

In the body of the opinion, *supra,* this court, speaking through Mr. Justice Dunn, after discussing the provisions of section 12 of the treaty between the United States and the Choctaws and Chickasaws, said:

"So that to our minds, from the language, it is clear that if the member, with his designated homestead, lived so long as 21 years from the date of the certificate, during that period he cannot lawfully sell this portion of his allotment; but to us it appears equally clear that, should he die even the next day after receiving his certificate to his homestead allotment, his heirs then (so far as this act is concerned) might sell the same free from any restriction on its alienation. * * * Now, if the heirs of a member of the tribe, as to his homestead, and the heirs of a freedman, may sell the lands allotted to their ancestor, immediately on his death, what possible reason can be assigned, or where is the language in the act which would preclude an immediate alienation by the heirs of those 'persons' (which word includes members, citizens, and freedmen) provided for under section 22, who never in fact selected their allotment, but whose allotments were selected solely for the benefit of and in the interest of the heirs? To our minds both are wholly wanting. Nor in our judgment is this restriction in any wise modified or limited by the terms of sections 15 and 16. To our minds it is reasonable to say and hold that lands or other property coming to an individual either by descent or purchase come to him with no restriction upon his rights to dispose of them, except the specific restriction with which their title is by clear terms burdened. This rule, we think, is applicable to the lands which were granted to these people under this treaty. If there is no specific language fixing a restriction, and no language from which an implication thereof may be plainly derived, then, in our judgment, none ought to be held to exist."

In the case of *Mullen v. United States,* 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 835, the same question was before the United States Supreme Court, involving the validity of conveyance made by Choctaw heirs of an allotment selected after the death of the parent and before patent had issued, in which case the United States Supreme Court, speaking through Mr. Justice Hughes in reference to an allotment of this character, said:

"The heirs of a deceased Indian allottee under the Supplemental Agreement of July 1, 1902, with the Choctaws and Chicka-

saws, have a complete equitable interest which, in the absence
of restrictions, they may convey before patent"
—the court further holding that conveyances by heirs of allot-
ments of this character were valid. The court, however, in dis-
cussing the questions involved in the Choctaw case and their
right to convey allotments under the conditions above referred to,
compares the similar provisions pertaining to the Creeks, saying:

"It is true that under the Creek Agreement, in cases where
the ancestor died before allotment, the lands were to be allotted
directly to the heirs, while under the Choctaw and Chickasaw
agreement the allotment was to be made in the name of the de-
ceased member and 'descent to his heirs.' This, however, is a
mere formal distinction and implies no difference in substance.
In both cases the lands were to go immediately to the heirs, and
the mere circumstance that, under the language of the statute,
the allotment was to be made in the name of the deceased an-
cestor instead of the names of the heirs furnishes no reason for
implying a requirement that there should be a designation of a
portion of the lands as homestead. We have, then, a case where
all the allotted lands going to the heirs are of the same character,
and there is no restriction upon the right of alienation expressed
in the statute. Had the lands been allotted in the lifetime of
the ancestor, one-half of them, constituting the homestead, would
have been free from restriction upon his death. The only diffi-
culty springs from the language of paragraph 16, limiting the
right of heirs to sell 'surplus' lands. But, on examining the con-
text, it appears that this provision is part of the scheme for
allotments to living members, where there is a segregation of
homestead and surplus lands respectively. Whatever the policy
of such a distinction which gives a greater freedom for the
disposition by heirs of homestead lands than of the additional
lands, there is no warrant for importing it into paragraph 22,
where there is no such segregation. It would be manifestly in-
appropriate to imply the restriction in such cases, so as to make
it applicable to all the lands taken by the heirs, and there is no
occasion or authority for creating a division of the lands so as
to impose a restriction upon a part of them. There being no re-
striction upon the right of alienation, the heirs in the cases in-
volved in this appeal were entitled to make the conveyance."

It is evident from the opinion, supra, that the court makes
the comparison of the provisions of the Choctaw and Chickasaw
Agreement with the provisions of the treaty with the Creek Tribe

pertaining to lands inherited in this wise, for the reason that the court believed that the construction placed on the provisions of the Creek Treaty by the Attorney General's department, the Assistant Attorney General's letter to the Secretary of the Interior being quoted in the opinion, and the construction placed thereon by the Commissioners to the Five Tribes and by the Department of the Interior, was correct, and, seeing no substantial difference between the provisions of the Creek Treaty and those of the Choctaw and Chickasaws, that therefore there should be no restriction, and was none as to the alienation of lands descending to the Choctaws and Chickasaws in this wise.

And following this conclusion in the case of *Reed v. Welty,* 197 Fed. 419, the United States District Court for the Eastern District of Oklahoma, in opinion rendered June 26, 1912, where the question involved was whether London and Ramsey Knight, full-blood Creek citizens who took as heirs of their father and mother who were entitled to allotments but died before taking same, could validly convey their interest in the land as they attempted to do by warranty deed dated July 26, 1904. The court, in an opinion rendered by Campbell, District Judge, quotes at length from the opinion of Mr. Justice Hughes in the Mullen case, *supra,* and concludes as follows:

"By section 20 of the Supplemental Agreement it appears that it was intended to modify and supplement the Original Agreement and repeal any conflicting provision in that agreement or any prior agreement, treaty, or law. So that, if the land was allotted to these heirs before the taking effect of the Supplemental Agreement, then their rights are fixed by the Original Agreement; if afterward, then, so far as the inquiry here is concerned, their rights are fixed by the Original Agreement as amended by section 16 of the Supplemental Agreement above quoted. The bill, however, while not giving the date of the allotment, alleges that the lands passed to the heirs under and by virtue of the Original Creek Agreement. Does the provision of section 7 of the Original Agreement, or of section 16 of the Supplemental Agreement, that the lands allotted to citizens shall not be alienable by the allottee or his heirs for the period of five years, apply to lands of the character involved in this case, or is that restriction to be confined in its application to lands allotted direct to living members and not to the lands allotted to heirs

of deceased members? In the Choctaw-Chickasaw Agreement, after providing for allotments to living members and for the selection of homesteads by them, inalienable for life, not exceeding 21 years, section 16 provided a term of restrictions upon the sale of lands other than homesteads allotted to members. Then section 22 provided that the lands of any member dying before receiving his allotment should be allotted in his name and should descend to his heirs according to the Arkansas law. Justice Hughes decides that in such case there is no warrant of law for selecting a homestead out of such an allotment. He further decides that the Choctaw-Chickasaw Agreement contemplated two classes of allotments: (1) Allotments to members of the tribes and to freedmen living at the time of the allotment; and (2) allotments made in the case of enrolled members entitled to allotment but dying before actual allotment had been made, and that the restriction prescribed in section 16 applies to the former and not to the latter. In the Creek Agreement the Commission is dealing with another one of the Five Tribes, but with the same object in view, that of the allotment of the tribal lands to the individual member, and the agreement is so similar to the Choctaw-Chickasaw Agreement in terms and arrangement that the two classifications of allotments found by Justice Hughes in the latter agreement may also be said to exist in the former, and, as in the Choctaw-Chickasaw Agreement, the restrictions upon alienation must be held to have only applied to the first class; that is, allotments to members of the tribe living at the time of allotment. It follows that on July 26, 1904, London and Ramsey Knight had an alienable interest in the land in question. * * *"

To the same effect is *Rentie v. McCoy*, 35 Okla. 77, 128 Pac. 244, which was a Creek allotment, the facts in which case are stated in the syllabus as follows:

"Scott Rentie, a minor, and a duly enrolled Creek freedman, died July 2, 1899, without a surviving widow or children; his allotment not then having been selected. On August 15, 1902, his distributive share of land, as a member of said tribe, was allotted to his heirs. On April 8, 1905, Morris and Katie Rentie, who were the father and mother of Scott Rentie, and his surviving heirs, executed in due form a warranty deed covering said allotment to D. On May 25, 1905, D. conveyed by warranty deed to E. M., who then and there took possession of said premises and remained in possession until he conveyed to H. M., to whom he surrendered possession. H. M. continued in possession until 1909, when an ejectment action was brought for possession.

*Held*: (a) That said land passed to Morris and Katie Rentie free from restrictions. (b) That said land was alienable on April 8, 1905, when Morris and Katie Rentie conveyed to D."

Also in *Deming Inv. Co. v. Bruner Oil Co.*, 35 Okla. 395, 130 Pac. 1157; the facts being stated in the syllabus as follows:

"Where a member of the Creek Tribe of Indians, entitled to be enrolled under section 21 of Act of Congress approved June 28, 1898, entitled 'An act for the protection of the people of the Indian Territory and for other purposes' [30 St. at L. 495, c. 517], died subsequent to the 1st day of April, 1899, but before having received the allotment of lands to which he was entitled as a member of said tribe of Indians, said lands, by reason of section 28 of the Original Treaty with the Creek Tribe of Indians [Act March 1, 1901, c. 676, 31 St. at L. 861], descended to his heirs, free from restrictions upon alienation imposed by section 7 of said Original Creek Treaty and by section 16 of the Supplemental Treaty with the Creek Tribe of Indians [Act June 30, 1902, c. 1323, 32 St. at L. 500], and a warranty deed, executed by the heirs after the allotment of said lands to them, conveyed the fee-simple title thereto."

We deem it unnecessary to cite further authorities, as the question is well settled in this court that in the case of a full-blood Creek Indian who was entitled to enrollment but died after April 1, 1899, after he had been enrolled but before receiving his allotment, his heirs took such allotment free from restrictions as to alienation and on August 15, 1904, could convey valid title to same.

It follows, therefore, that if Little Peter died in the latter part of 1889, after having been enrolled, but before taking his allotment, that the allotment which he could have taken had he lived passed to his heirs, and that the deed executed August 15, 1904, by such heirs, conveying said allotment to Nicholas V. Bilby, was a valid deed and conveyed all the title which said heirs had in said land, and that therefore the deed executed by said heirs on October 31, 1908, pretending to convey said land to J. O. Chapman, was void and of no effect for the reason that at that time said heirs had no title in said land, having conveyed all their title to Nicholas V. Bilby on August 15, 1904. This being true, it follows that the lease through which John S. Bilby claimed was valid, and that John S. Bilby was entitled to posses-

sion of said premises as against any and all parties claiming under or through defendant in error, John W. Gilliland.

Hence the judgment of the lower court must be reversed, with instructions to render judgment in accord with this decision.

By the Court: It is so ordered.

### ON REHEARING.

PER CURIAM. After careful consideration of the points urged by defendant in error for rehearing, and a careful re-reading of the record, we find that the propositions urged in the petition for rehearing are not well taken.

We further find, as disclosed by the record, that the quitclaim deed from John O. Chapman to John W. Gilliland, upon which Gilliland relies for recovery in this action, was executed and delivered January 17, 1910, and that, at the time this quitclaim deed was executed and delivered, R. V. Bilby, through his tenants, was then in possession and absolute control of the premises in question, and that Gilliland, through his tenants, made no pretentions to get possession of such premises until November or December, 1910, after the crops for that year had been gathered and Bilby had received the rents and profits; that even then he obtained possession under questionable means.

We further find from the record that under Gilliland's own testimony he knew, at the time he took the quitclaim deed from Chapman, that Bilby had a deed from the heirs of Little Peter on record. On page 49 of the record he says:

"Q. Didn't you know he had a deed on that land and was claiming it? A. I knew he had an old void deed on it; yes, sir."

On further cross-examination (page 50) he says:

"Q. You understood he had a deed from all the other heirs? A. I saw the deed on record. Q. You saw this deed that I now hand you on record (handing witness paper)? A. I saw the deed that is the copy of; yes, sir. Q. You saw that before you purchased the land, didn't you? A. Certainly. * * * Q. You never had any agreement or understanding with Mr. Bilby by which you was to get in possession of these lands, did you? A.

I did not. Q. Did you receive any rents for these lands for the year 1910? A. No, sir."

Hence, under Gilliland's own testimony, he took the quit-claim deed from Chapman at a time when Bilby was in full possession and complete control of the premises in question, and had been for a period of more than five years, under a duly recorded deed from the heirs of Little Peter, during which time neither the heirs nor Chapman had received any of the rents and profits from said premises, nor pretended to lay any claim to same or exercise any control over same. Therefore, under the authority of *Miller v. Fryer,* 35 Okla. 145, 128 Pac. 713, opinion by Justice Hayes, the syllabus of which is as follows:

"By reason of section 2215, Comp. Laws 1909 [Rev. Laws 1910, sec. 2260], a deed conveying real estate, executed by a grantor at a time when he was not in possession of the conveyed premises, is void as between the grantee and a person who was at the time of the conveyance in adverse possession of the conveyed premises; and this rule applies where the grantor is an allottee of the Chickasaw and Choctaw Tribes of Indians upon whose power to alienate his allotment the restrictions have been removed prior to the time of the execution of the deed, and where the person in possession originally obtained possession and claims title to the conveyed premises by virtue of a void deed executed by the allottee before the removal of restrictions upon his power to alienate his allotted lands"

—and also *Ruby v. Nunn,* 37 Okla. 389, 132 Pac. 128, opinion by Brewer, C., the syllabus of which is as follows:

"By reason of section 2215, Comp. Laws 1909 [Rev. Laws 1910, sec. 2260], a deed conveying real estate, executed by a grantor at the time not in possession of the conveyed premises, is void as between the grantee and a person who was at the time of the conveyance in adverse possession of the conveyed premises; and this rule applies where the grantor is an allottee of the Creek Tribe of Indians, upon whose power to alienate his allotment the restrictions have been removed prior to the time of the execution of the deed, and where the person in possession originally obtained possession and claimed title to the conveyed premises by virtue of a void deed executed by the allottee before the removal of restrictions upon his power to alienate his allotted lands"

—the deed from Chapman to Gilliland was champertous and void as between Gilliland and Bilby.

The former opinion, therefore, with this addition, is adhered to.

By the Court: It is so ordered.