**MOFFETT et al. v. CONLEY et al.**

No. 5825—Opinion Filed July 25, 1916.

Rehearing Denied December 19, 1916.

(163 Pac. 118.)

(Syllabus by the Court)

1. **Indians—Lands—Title—Heirs.**

As to lands allotted under section 11, Curtis Act June 28, 1898, c. 517, 30 Stat. 495, 497, in the name of a deceased Creek Indian, which allotment was confirmed by Original Creek Agreement March 1, 1901, c. 676, sec. 6. 31 Stat. 861, 863, as well as lands allotted in the name of said deceased Creek citizen pursuant to section 28 of said latter agreement, where the patent thereto issued to "the heirs" of the deceased ancestor, such heirs took the title by inheritance, and not by purchase.

2. **Descent and Distribution—Nature of Right — "Descent" — "Hereditary Succession"—"Heir"—"Inheritance."**

At common law, "descent," or "hereditary succession," is the title whereby a man on the death of his ancestor acquires his estate by right of representation, as his heir at law. An "heir," therefore, is he upon whom the law casts the estate immediately upon the death

of the ancestor; and an estate, so descending to the heir, is in law called the "inheritance."

3. **Indians—Lands—Conveyances—Statutory Provision.**

Section 22, Act April 26, 1906, c. 1876, 34 Stat. 137, providing "that the adult heirs of a deceased Indian of either of the Five Civilized Tribes, whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent," but which further provides that all conveyances made by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, applies to conveyances by adult full-blood Creek heirs to an allotment selected and set apart in the right of a deceased ancestor after his death; the patent thereto made to "the heirs" of such deceased Indian.

4. **Same—Restrictions on Alienation—Power of Congress.**

Congress, in pursuance of the long-established policy of the government, has the right to determine for itself when the guardianship of the Indians which has been maintained shall cease. It may, in the exercise of its constitutional authority, and while the guardianship relation over full-blood Indians continues, impose restrictions on full-blood Indian heirs, requiring that conveyances by them of inherited allotted lands be approved by the Secretary of the Interior; and this without regard to the fact that the land descended to the heirs free of all restrictions on alienation, except the disability of minority.

5. **Same — Conveyances—Validity—Approval of Deeds.**

A conveyance by an adult full-blood Indian heir, of inherited allotted lands, made August 9, 1907, was, as to a portion of the lands attempted to be conveyed, approved by the Secretary of the Interior April 13, 1911, pursuant to the act of April 26, 1906. On September 25, 1908, said heir sold and conveyed said land to a third party, and on October 6, 1908, said sale and conveyance was approved by the county court having jurisdiction of the settlement of the estate of the deceased ancestor, as provided in section 9 of the act of May 27, 1908, c. 199, 35 Stat. 312. Held, that the rights of the second purchaser having intervened, and the first deed being without force until approved, the subsequent approval thereof was without effect upon the title of the grantee in the second deed.

6. **Same—Title—Equitable Rights.**

The conveyances through which the intervener claimed an equitable title to lands as against both the grantee named in the deeds and his subsequent grantee not being approved by the Secretary of the Interior, except as to a part of the lands, and that after the rights of third parties had attached, the

equitable rights of said intervener, being dependent thereon, must fall with the legal title.

Hardy, J., dissenting.

Error from District Court, Tulsa County; L. M. Poe, Judge.

Action by Lilly Jackson, through her guardian, W. C. Horton, against J. S. Moffett and others, and Nellie B. Conley, as administratrix of the estate of H. T. Conley, deceased, intervened. From a judgment for the intervener, the defendants other than Mack McCoy bring error. Reversed.

C. C. Herndon and Martin, Bush & Moss, for plaintiffs in error.

Biddison & Campbell, for defendants in error.

SHARP, J. Moses Coney, a full-blood adult Creek Indian, died intestate in the month of June, 1900, leaving him surviving, as his sole heirs at law, Jennie Hickory and Tom Coney, both of whom were full-blood Creek Indians. Subsequent to the death of Moses, and on different dates, there was allotted in his name the following described and numbered tracts of land: Tract No. 1, consisting of lots 1, 2, and 3 in section 13, township 19 north, range 12 east, allotted May 24, 1901; tract No. 2, consisting of the east 7.03 acres of lot 1, section 14, township 19 north, range 12 east, allotted February 25, 1904, and tract No. 3, consisting of the E. ½ of the N. E. ¼ of section 27, township 19 north, range 13 east, allotted August 22, 1902. Patents to said lands thereafter issued to "the heirs of Moses Coney, deceased," by the Principal Chief of the Creek Nation. On the part of the plaintiffs in error, it is claimed that tract No. 1 was allotted to Moses Coney February 2, 1900, or some four months before his death. The record discloses that on the day last named, Moses Coney made formal application to allot said tract, though it does not appear that his selection was acted upon, or approved by the allotting commission, or that a certificate of selection issued until May 24, 1901. We will therefore consider, as the trial court found, that the entire allotment made in the name of Moses Coney was set apart in his name and right by the Commission to the Five Civilized Tribes after his death.

As to tract No. 1, both the allotment and the death of Moses Coney occurred within the period during which section 11 of the Curtis Act (Act June 28, 1898, c. 517, 30 Stat. at L. 495, 497) was in force in the Creek Nation, by the terms of which the Commission was directed, upon the completion of the citizenship rolls and the survey of the lands of the tribe, to "proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof," with reservations not here involved. That part of the allotment, therefore, comes within the category of allotments confirmed by the Original Creek Agreement (Act March 1, 1901, c. 676, sec. 6, 31 Stat. at L. 861, 863). Tracts numbered 2 and 3 were allotted pursuant to section 28 of the Original Creek Agreement, which provided that if any enrolled citizen died on or subsequent to the 1st day of April, 1899, before receiving his allotment of land and distributive share of the funds of the tribe, "the lands and moneys to which it would be entitled, if living, shall descend to its heirs," and which act was amended by the Supplemental Agreement of June 30, 1902 (32 Stat. at L. 500, c. 1323), effective August 8, 1907, in respect to the law controlling its descent.

The title and claim of the intervener, Nellie B. Conley, as administratrix of the estate of her deceased husband, H. T. Conley, depends upon the validity of two certain deeds executed by Jennie Hickory, one of the heirs of Moses Coney, deceased, to John R. Skinner, which deeds are dated, respectively, July 24, 1907, and August 9, 1907. April 13, 1911, the Secretary of the Interior, pursuant to the act of April 26, 1906 (34 Stat. at L. 137), approved the conveyance of Jennie Hickory to tract No. 1. As to the remaining tracts, it does not appear that the approval of the Secretary of the Interior to any conveyance thereof was procured. Prior to the approval of the Secretary of the deed to tract No. 1, and on the 25th day of September, 1908, Jennie Hickory, joined by her husband, conveyed her interest in and to tract No. 1 to L. L. Lewis, which said sale and deed was, on the 6th day of October, 1908, approved by the county court of Tulsa county, as the deed of a full-blood Indian heir conveying inherited lands. July 21, 1909, Lewis conveyed his interest in said land to the plaintiff in error, Moffett, and it is under this latter chain of title that Moffett defended against the claim of the intervener.

We may here dismiss from consideration the land described as tract No. 2, as it does not appear that this tract was included in either of the deeds to Skinner. As the title of the administratrix, Nellie B. Conley, depends entirely upon the validity of the deeds of conveyance made to Skinner, and as she is seeking to impress a trust upon the lands as against both Skinner and Moffett, it was incumbent upon her, in asserting an equitable title to an interest in said lands, to first show that those against whom she sought relief ac-

quired under their conveyances the legal title; for if the deed from Jennie Hickory to Skinner was made in contravention of a controlling statute, and hence void, neither Skinner nor his grantee, Moffett, would have any title against which a decree could be enforced, and this without regard to the nature of relations or character of the arrangement that may have existed between Conley and Skinner, in the latter's purchase of the land.

It is first urged by the defendant in error that Jennie Hickory acquired her title to the lands allotted in the name of her deceased father, not by inheritance, but by purchase, and for that reason section 22 of the act of April 26, 1906 (34 Stat. at L. 137), providing that all conveyances to inherited lands by heirs who are full-blood Indians are subject to the approval of the Secretary of the Interior, has no application. We have already seen that section 28 of the Original Agreement authorized allotments of the character in question to be made, and that it was there provided that lands to which the enrolled citizen, if living, would be entitled "shall descend to his heirs" according to the Creek law. Technically, Jennie Hickory and her brother took their title directly from the tribe. The title taken, however, was not in their own right, or by reason of their own enrollment, but in the right of their deceased ancestor and by reason of his tribal enrollment. Moses Coney was one of the units counted in determining into how many allottable parts the tribal domain should be divided, and therefore was one of those to whom it was contemplated an allotment should be made. Levindale Lead & Zinc Co. v. Coleman, 241 U. S. 432, 36 Sup. Ct. 644, 60 L. Ed. 1080. The allotment selected and made subsequent to his death was made in satisfaction of the right which he, as one of the enrolled citizens and allottable units of the tribe, had in his lifetime. The heirs took their title, therefore, not because of their enrollment as tribal citizens alone, but because they were his heirs; because they were related to him by consanguinity, and succeeded to his rights at his death. That the children of Moses Coney did not take their title by purchase is, we think, settled by both the decisions of this court and the federal courts in cases arising in this state. Barnett v. Way et al., 29 Okla. 780, 119 Pac. 418; Divine v. Harmon et al., 30 Okla. 820, 121 Pac. 219; Rentie et al. v. McCoy, 35 Okla. 77, 128 Pac. 244; Shulthis v. McDougal, 170 Fed. 529, 95 C. C. A. 615; Washington v. Miller, 235 U. S. 422, 35 Sup. Ct. 119, 59 L. Ed. 295; McDougal v. McKay, 237 U. S. 372, 35 Sup. Ct. 605, 59 L. Ed. 1001; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310.

It may be helpful, however, to a complete understanding of the nature of the title acquired by Jennie to look to the authorities classifying and defining the different general classes of estates as they exist at common law.

"Methods of acquiring, and of losing, a title to estates in things real, are adduced by our law to two," it is said in Blackstone's Commentaries, sec. 201: "Descent, where the title is vested in a man by the single operation of the law; and purchase, where the title is vested in him by his own act or agreement."

Of titles by descent, the author in the same section says:

"Descent or hereditary succession is the title whereby a man on the death of his ancestor acquires his estate by right of representation, as his heir at law. An heir, therefore, is he upon whom the law casts the estate immediately upon the death of the ancestor; and an estate, so descending to the heir, is in law called the inheritance."

Speaking of title by purchase, the author, in section 241, says:

"Purchase, perquisite, taken in its largest and most comprehensive sense, is thus defined by Littleton: 'The possession of lands and tenements, which a man hath by his own act or agreement, and not by descent from any of his ancestors or kindred.' In this case it is contradistinguished from acquisition by right of blood, and includes every other method of coming to an estate, but merely that of inheritance, wherein the title is vested in a person, not by his own act or agreement, but by the single operation of the law."

In Coke's Commentary on Littleton, 18b, the author says:

"A purchase is always intended by title, and most properly by some kind of conveyance either for money or some other consideration, or freely of gift; for that is in law also a purchase. But a descent, because it cometh merely by act of law, is not said to be a purchase; and accordingly the makers of the act of Parliament in 1 H. 5. ca. 5. speak of them that have lands or tenements by purchase or descent of inheritance."

"Property of lands by descent is," says Lord Bacon, "where a man hath lands of inheritance, and dieth, not disposing of them, but leaving it to go (as the law casteth it) upon the heir. This is called descent of law." (Bacon, Law Tracts, 128.)

In Washburn's Real Property, sec. 1824, it is said that in one thing all the writers agree, and that is considering that there are two modes only, regarded as classes, of acquiring title to land, namely, descent and purchase; purchase including every mode of acquisition known to the law except that by which an heir, on the death of an ancestor, becomes substituted in his place as owner by

act of the law. Additional authorities in point are Hamilton v. Homer et al., 46 Miss. 378, 395; Hoyt v. Van Alstyne, 15 Barb. (N. Y.) 568; Watson v. Donnelly, 28 Barb. (N. Y.). 653; Ramsey v. Ramsey, 7 Ind. 607; Purczell v. Smidt, 21 Iowa, 540, 546; Estate of Donahue, 36 Cal. 329; Spielmann v. Kliest, 36 N. J. Eq. 199; Delaney v. City of Salina, 34 Kan. 532, 9 Pac. 271; Delay v. Chapman, 3 Or. 459; Bouvier's Law Dict. vol. 3; Rapalje & Lawrence, Law Dict.; Black's Law Dict.

That the lands were not allotted in the lifetime of Moses Coney, but in his place and stead, and on account of his right, does not serve to change the character of the estate. The lands allotted on his account were not intended as a bounty or gratuity to the heirs by the tribe; they neither gave nor did anything in bringing about the title. The rights of Jennie Hickory's father attached during his lifetime, and it was in that right that the lands were subsequently set apart as an allotment. Jennie and her brother, standing in the ancestor's place and representing him under the statute, succeeded to the same rights that Moses had at the time of his death. This right constituted an estate of inheritance and went by operation of law to his heirs. It is not necessary that technically the land itself descended to the heirs, for it is sufficient to say that they took in the nature and course of descent. It was so held in Shelley's Case (Wolfe v. Shelley, 1 Rep. 98, 76 Eng. Rep. Reprint, 206, 222), where in the course of the opinion it is said:

"Where the heir takes anything which might have vested in the ancestor, the heir should be in by descent; then, although it has vested in the heir and never in the ancestor, yet the heir shall take it in the nature and course of a descent; but in the case here the use might have vested in Edward Shelley, and if it had vested in Edward, then Richard Shelley would have taken it by descent, and therefore Richard in this case ought to take this use in the nature and course of a descent."

In Lessee of Bond v. Swearingen, 1 Ohio, 395, 407, 408, Act Cong. August 10, 1790, c. 40, 1 Stat. 182, enabled the officers and soldiers of the Virginia line, on continental establishments, to obtain titles to certain lands lying northwest of the Ohio river. After various provisions respecting the locations and surveys of said lands, the act directed that the President should cause letters patent to be issued for the lands designated in said entries to the persons originally entitled thereto, their heirs or assigns, or their legal representatives, their heirs or assigns. By virtue of this provision a patent issued to the heirs of one Massie. Of the title acquired by them, the court said:

"It is because they, standing in his place and representing him, are entitled to the same rights he had at his death. They take the same interest he would have taken had the patent issued to him in his lifetime. * * * The entry of the ancestor, the warrant under which it was made, the survey had thereon, and the acts of Congress regulating the appropriation of the land, and the issuing of the patent, are all referred to, and all show it was not a gift by the government to the heirs of Massie, but it was the execution of a trust in his favor, so far as the same could be executed after his death, by transferring to his heirs the naked legal title to lands for which he had fully appropriated and for which he was in his lifetime entitled to a patent."

There was no pretense of any consideration moving from the heirs for the grant under which it was claimed they held as purchasers; on the contrary, the patent furnished conclusive evidence that the consideration moved from the ancestor. After citing Shelley's Case, the opinion proceeds:

"In Wood's Case, reported in 2 Rolle, determined in the court of Rolls, 3 Eliz., and recognized as law in Shelley's Case, it was held 'that if a man seized of a manor of S. covenants with another that when J. S. shall enfeoff him of the manor of D., that he will stand seized of the manor of S. to the use of the covenantee and his heirs, the covenantee dies, J. S. enfeoffeth the covenantor, the heirs shall be adjudged in the course and nature of descent,' and yet it was neither a right, title, use, nor action that descended, but only a possibility of a use, which would neither be released nor discharged, yet it might, if the consideration had been performed, have vested in the ancestor."

And it was held that Massie by his warrant, entry, and survey had acquired an incomplete or inchoate legal title to the land designated in his entry; that this right and title was not destroyed by the death of the ancestor, but descended to the heir as a part of his estate; and if a patent afterwards issued to the heir, it did not enlarge his estate or increase the quantum of his interest in the land, but changed the evidence of his right from an entry and survey to a grant from the government.

In Sizemore v. Brady, 235 U. S. 441, 35 Sup. Ct. 135, 59 L. Ed. 308, Ellis Grayson was living April 1, 1899, and entitled to enrollment. Had he lived he would have been entitled under the Original Agreement to participate in the allotment and distribution of the tribal property. But he died March 1, 1901, before the agreement went into effect, and without receiving any part of the lands or funds of the tribe. It was said in the opinion:

"In these circumstances the agreement contemplated that his heirs should take his place in the allotment and distribution, and should receive 'the lands and money to which he would be entitled, if living.' "

Moses Coney, in the case at bar, was duly enrolled, and had taken steps toward selecting a portion of his allotment, at the time of his death. His share of the lands of the tribe of which he was an enrolled member was due him, and would 'have been arbitrarily selected for him or on his account had he or his legal representative neglected to do so. It, therefore, is obvious that his heirs took the title to the proportionate share of the tribal lands to which he was entitled, not by purchase, but by inheritance. It is necessary, therefore, only to determine the right, if any, of his heirs to alienate or convey the lands thus inherited by them. It is well settled by both the decisions of this court and of the Supreme Court of the United States that Creek allotments, made on behalf of deceased members of the tribe under the authority of section 28 of the Original Agreement, or of sections 7 and 8 of the Supplemental Agreement, passed to the heirs free of restrictions upon alienation, except the disability of minority. Rentie v. McCoy, 35 Okla. 77, 128 Pac. 244; Deming Inv. Co. v. Bruner Oil Co, 35 Okla. 395, 130 Pac. 1157; Bilby v. Gilliland, 41 Okla. 678, 137 Pac. 687, 139 Pac. 988; Skelton v. Dill, 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198; Adkins v. Arnold et al., 235 U. S. 417, 35 Sup. Ct. 118, 59 L. Ed. 294; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310.

The conveyances involved and brought under review were made subsequent to the passage of the act of April 26, 1906 (34 Stat. at L. 137), and were not (except as will be hereafter more fully shown) approved by the Secretary of the Interior, as provided by section 22 of said act. Is the section applicable to allotments made to the heirs of a deceased member of the tribe? By the plaintiffs in error it is insisted that it is, while the defendants in error contend that it was not the purpose of the act to impose restrictions on unrestricted lands, and that hence section 22 has no application. The section in part provides:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent."

Moses Coney belonged to the class named. His daughter, Jennie, was an adult heir of a "deceased Indian" of the Creek Nation. The land had been selected and a patent or patents thereto had issued to the heirs for Moses' share of the land of the Creek Tribe, to which tribe, he during his lifetime belonged. Jennie, like her father, was a full-blood Creek, and while she had the right to sell and convey, her conveyance was, by the terms of the act, made subject to the approval of the Secretary of the Interior. The purpose of the provision of the statute requiring the approval of her conveyance was her protection, to secure to her the fair value of her land. Tiger v. Western Inv. Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; Brader v. James, 49 Okla. 734, 154 Pac. 560. The statute affording her this protection should be liberally construed, to the end that the beneficent purpose of Congress may not be defeated. Woodward v. De Graffenried, supra; United States v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192. Or, as said in Levindale Lead & Zinc Mining Co. et al. v. Coleman, 241 U. S. 432, 36 Sup. Ct. 644, 60 L. Ed. 1080:

"The provisions of the allotment act must be construed in the light of the policy they were obviously intended to execute. It was the policy relating to the welfare of Indians, wards of the United States. The establishment of restrictions against alienation 'evinces the continuance, to this extent, at least, of the guardianship which the United States had exercised from the beginning' " (citing cases).

Her knowledge of land values, of transactions in respect to the disposition thereof, and her dependency in general, were not made to rest, nor did it depend in any respect, upon the fact that the land was or was not allotted in the lifetime of her father.

In Shulthis v. McDougal, 170 Fed. 529 95 C. C. A. 615, Andrew J. Berryhill was the son of George Franklin Berryhill, a member of the Creek Nation, of mixed blood, and Clementine Berryhill, his wife, a noncitizen of that tribe. Andrew was born on the 6th day of May, 1901, and died in November following. At no time during his life was he entitled to enrollment as a member of the tribe, or to an allotment of its property. After his death, by the terms of the Supplemental Agreement, it was provided in section 7 that children of his class should be placed on the rolls. After enrollment of the deceased child an allotment in his right was made, and on June 5, 1906, the father and mother conveyed the lands so allotted to the McKays. It was contended that the deed was void, because at the time of its execution the grantors were without legal capacity to make such a conveyance. Both parties based their right upon section 22 of the act of April 26, 1906. It was urged that the land

in question was not "inherited" land, answering which claim it was said:

"For reasons already explained, that contention, while technically right, is substantially wrong. The scheme of the statute clearly indicates that the land was to be regarded the same as if it had been inherited. No sound reason can be adduced for treating these lands otherwise than they would have been treated if Andrew J. Berryhill had survived long enough to receive the allotment. * * * The lands here in question fall under the same policy as lands obtained by inheritance, and the statute should be held to apply thereto. Berryhill, therefore, had power to make the deed to the McKays."

Both the land of Andrew J. Berryhill and Moses Coney, in the hands of their respective heirs, was "inherited" land. The father of Berryhill being of mixed blood, that part of section 22 requiring the approval of his conveyance by the Secretary of the Interior did not apply. The heirs of Moses Coney being full-blood Indians, the validity of the conveyance of Jennie Hickory depended upon the approval thereof, as required by the statute.

Having determined that the land in the hands of the heirs was inherited land within the meaning of section 22 of the act of April 26, 1906, the opinion of this court in Brader v. James, 49 Okla. 734, 154 Pac. 560, is controlling. In that decision we reviewed at some length the decisions respecting restrictions upon the alienation of Indian lands; and it will be sufficient here to say that Congress, in pursuance of the long-established policy of the general government, has a right to determine for itself when the guardianship which has been maintained over the Indians shall cease; also that Congress, in the exercise of its constitutional authority, and while the guardianship relation over full-blood Indians continues, may impose restrictions on full-blood Indian heirs, requiring that conveyances by them of inherited allotted lands be approved by the Secretary of the Interior; and this, notwithstanding the restrictions imposed by prior legislation have expired by limitation or by the death of the allottee.

Upon the authority of United States v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192, and the cases there cited, it is sufficient to say that neither on April 26, 1906, nor at any of the times involved, had Congress by word or deed terminated the guardianship over full-blood Creek Indians committed to it by the federal Constitution. On the other hand, as shown by the several acts of Congress dealing with the affairs of the Creek Indians, as expressed by us in Brader v. James, supra:

"At all times, on and since the passage of the act [April 26, 1906], has the government shown a most determined and persistent purpose to continue the exercise of the authority derived from its guardianship relation, and in the Enabling Act to see that the power was reserved to it."

Of the right of Congress to surrender its guardianship over the Indians, it is said, in United States v. Nice, supra:

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians, or placing them beyond the reach of congressional regulations adopted for their protection."

The opinion in the above case is noteworthy, in that it expressly overrules the former opinion of that court, in Re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, long a leading authority, and from its consideration of what acts on the part of Congress, or duties assumed by the administrative officers of the government, furnish evidence of an intention to continue the national guardianship over the Indians.

In the recent case of Sampson et al. v. Staples, 55 Okla. 547, 155 Pac. 213, it was held that conveyances of inherited lands, made in 1910 and 1911 by the full-blood heirs of a Mississippi Choctaw Indian who died in 1903. are void unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee, under section 9 of the act of May 27, 1908 (35 Stat. at L. 315, ch. 199). In that case Louisiana Sampson died before receiving her allotment; the land thereafter being allotted in her name under section 22 of the act of Congress approved July 1, 1902 (32 Stat. at L. 641, ch. 1362). But it is said by counsel for defendants in error that there is a material difference between section 22 of the Choctaw and Chickasaw Agreement and section 28 of the Original Creek Agreement, respecting the character of the estate that vested in the heirs to land allotted after death of the enrolled citizen, as provided for in said section. The precise point was urged in Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834; in answer to which it was said:

"It is true that under the Creek Agreement, in cases where the ancestor died before allotment, the lands were to be allotted directly to the heirs, while under the Choc-

taw and Chickasaw Agreement, the allotment was to be made in the name of the deceased member, and 'descend to his heirs.' This, however, is a merely formal distinction and implies no difference in substance. In both cases the lands were to go immediately to the heirs. * * *"

Nor is Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, in conflict with anything said by us in Brader v. James, or with the former opinion of the Supreme Court in Tiger v. Western Investment Co, 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. In our opinion in the Brader Case attention was called to the distinction between the right to exemption from taxation based on a sufficient consideration, as involved in Choate v. Trapp, and the power of Congress to impose a limitation on alienation, as held in Tiger v. Western Investment Co. Since our opinion was handed down, the same distinction was observed by the Supreme Court in Williams et al. v. Johnson, 239 U. S. 414, 36 Sup. Ct. 150, 60 L. Ed. 358, as appears from the following portion of the opinion:

"It has often been decided that Indians are wards of the United States, and that Congress has plenary control over tribal relations and property, and that this power continues after the Indians are made citizens, and may be exercised as to restrictions upon alienation. Tiger v. Western Investment Co.. supra. Against this ruling, Choate v. Trapp does not militate. In the latter case it was decided that taxation could not be imposed upon allotted land, a patent to which was issued under an act of Congress containing the provision 'that the land should be nontaxable' for a limited time;' and, excluding the application of the Marchie Tiger Case, it was said that exemption from taxation 'and nonalienability were two separate and distinct objects.' And, further, 'One conveyed a right and the other imposed a limitation.' The power to do the latter was declared, and it was said: 'The right to remove the restriction [limitation upon alienation] was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indians and was binding upon Oklahoma."

In United States v. Western Investment Co., 226 Fed. 726, 141 C. C. A. 482, it was held that, though the period for which the Creek Agreement made a prior allotment to an Indian. confirmed thereby, inalienable by the allottee or his heirs without the approval of the Secretary of the Interior expired before enactment of the act of April 26, 1906, prohibiting full-blood heirs of a deceased Indian from conveying his land without approval of such officer, a conveyance by such heirs of such land after such enactment was subject thereto.

The deed from Jennie Hickory of August 9, 1907, covering tracts 1 and 3, names a consideration of $2,000 cash in hand paid. April 13, 1911, the Secretary of the Interior approved said latter conveyance as to tract 1 only, as appears from the following indorsement thereon:

"Department of the Interior, Washington. D. C. April 13, 1911 Pursuant to the act of April 26, 1906 (34 Stat. at L. 137), this deed is hereby approved in so far as it operates to convey the right, title and interest of Jennie Hickory, nee Coney, as a full-blood Indian heir, in and to lots one (1) and two (2) and three (3) of section thirteen (13) township nineteen (19) north, range twelve (12) east, allotted to Moses Coney, a citizen of the Creek nation. roll No. 4833, who appears to have died prior to May 27, 1908, but without prejudice to the right, if any, of any other heir of said allottee. [Signed by the Assistant Secretary of the Interior.]"

Thus the Department of the Interior construed the act as vesting in the head of said department jurisdiction over and power to approve or disapprove conveyances of the class involved. But it will be remembered that on the 25th day of September, 1908, Jennie Hickory conveyed her interest in said tract to L. L. Lewis, and that her sale and conveyance thereof was approved October 6, 1908, by the county court of Tulsa county, pursuant to the act of May 27, 1908 (35 Stat. at L. 312, ch. 199), so that it will not do to say that the approval by the Secretary of the Interior of the former deed to Skinner, long subsequent to the conveyance to Lewis, defeats the latter's title Until approved the Skinner deed was without legal effect, and prior to the date of its approval the rights of Lewis intervened. Any doubt upon the question is set at rest by the opinion in Pickering v. Lomax et al., 145 U. S. 310, 12 Sup. Ct. 860, 36 L. Ed. 716, where it was held that the permission of the President of the United States to a deed of lands conveyed by the treaty of Prairie du Chien, required to be given in order to make the deed valid, might be given 13 years after the execution of the deed, and, if given then, made the title perfect, which before then had been imperfect; provided, that no third persons had in the meantime legally acquired an interest in the land.

It is unnecessary to consider the rights of the administratrix as against either Skinner or Moffett, on account of the conveyances of July and August, 1907, as neither of them acquired any title thereby, for reasons already stated. Upon the validity of the conveyances to Skinner, rested the equitable

claim or title of Conley, and as Skinner took no title, either originally or on account of the subsequent approval of the conveyance as to tract 1, the said claim, being dependent thereon, must fail.

As the burden of establishing her title rested upon the intervener, and as she failed in her proof, it follows that the judgment of the trial court must be reversed; and it is so ordered.

All the Justices concur, except HARDY, J., who dissents.